196 F.3d 207 (4th Cir. 1999)
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
WILLIE JAMES RHYNES, a/k/a Big Will, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
MICHAEL SEVANE RHYNES, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
THEODORE ADAMS, a/k/a Cripple Thado, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
PURVIS H. GORMLEY, a/k/a Lightbread, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
JOHN WAYNE WHITE, a/k/a Whitey, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
LESTER MCCOY, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
ALEXANDER ADAMS, a/k/a Fats, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
MICHAEL SEVANE RHYNES, Defendant-Appellant.
 No. 97-4465 No. 97-4466 No. 97-4467 No. 97-4468 No. 97-4469 No. 97-4470 No. 97-4602 No. 97-4640 (CR-96-6-V).
 UNITED STATES COURT OF APPEALS, FOR THE FOURTH CIRCUIT.
 Argued: December 4, 1998.
Decided: October 26, 1999.
Filed: November 8, 1999.
 
 Appeals from the United States District Court for the Western District of North Carolina, at Charlotte.
 Richard L. Voorhees, District Judge.
 NOTE: OPINION VACATED IN PART. SEE AMENDED OPINION AT 206 F.3d 349.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL ARGUED: Noell Peter Tin, FERGUSON, STEIN, WALLAS, ADKINS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina; Claire J. Rauscher, Charlotte, North Carolina; Michael Smith Scofield, Charlotte, North Carolina; Gregory Bruce Park, LANGE & PARK, Charlotte, North Carolina; John Keating Wiles, CHESHIRE & PARKER, Raleigh, North Carolina, for Appellants. Gretchen C.F. Shappert, Robert Jack Higdon, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. ON BRIEF: Joseph B. Cheshire, IV, CHESHIRE & PARKER, Charlotte, North Carolina, for Appellant Willie Rhynes; Barry M. Storick, Charlotte, North Carolina, for Appellant White; Mark P. Foster, Jr., Charlotte, North Carolina, for Appellant Gormley.
 Before WILKINSON, Chief Judge, KING, Circuit Judge, and WILLIAMS, United States District Judge for the District of Maryland, sitting by designation.
 Affirmed in part, judgment withheld in part by published opinion. Judge Williams wrote the opinion, in which Chief Judge Wilkinson joined. Judge King wrote an opinion concurring in part and dissenting in part.
 OPINION
 WILLIAMS, District Judge:
 Appellants Willie James Rhynes ("W. Rhynes"), his son Michael Sevane Rhynes ("M. Rhynes"), Theodore Adams ("T. Adams"), Purvis H. Gormley ("Gormley"), John Wayne White ("White"), Lester McCoy ("McCoy"), and Alexander Adams ("A. Adams") appeal their convictions. Appellants in this case raise numerous issues, which will be addressed in turn. For the reasons that will follow, we affirm the judgments of the district court, except that we withhold judgment for thirty days on the convictions of W. Rhynes, A. Adams, and T. Adams on Count I, as more fully explained below.
 I.
 Defendants were accused of being members of a large scale drug conspiracy, which had begun in Charlotte, North Carolina, and had existed over twenty-five years. W. Rhynes was accused of being the leader of the conspiracy. Defendants were charged with conspiracy to possess with intent to distribute cocaine, cocaine base, heroin, and marijuana in violation of 21 U.S.C. § 846. W. Rhynes was also charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). T. Adams, W. Rhynes, M. Rhynes, and Gormley were also charged with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 371 and 1956(h).
 Prior to trial, W. Rhynes moved to suppress evidence seized from his residence and businesses, arguing that the search warrants upon which the items were seized contained stale information. United States Magistrate Judge Carl Horn denied that motion, and the district court adopted that decision.
 During the three-week trial in the United States District Court for the Western District of North Carolina at Charlotte, the United States of America ("Government") presented over twenty witnesses who were alleged to be conspirators or participants in the drug trade of defendants. The Government also presented eight law enforcement officers, large quantities of drug paraphernalia, and a package containing heroin and cocaine. This package, which was seized from the United States Express Mail Service, bore the label of S&S Food Mart, but had the address of, and was delivered to, the Clifford Place Big Apple Store.
 Defendants also called numerous witnesses. One of the witnesses for defendant M. Rhynes was Corwin Alexander ("Alexander"). During the course of Alexander's testimony, it became clear that he had been informed of previous testimony in the case. Counsel for defendant M. Rhynes admitted that he had questioned Alexander about some of the prior testimony in order to determine whether he would exercise his rights under the Fifth Amendment to the United States Constitution if he took the stand. The district court ruled that its sequestration order had been violated, and struck Alexander's testimony.
 At the end of the trial, the jury deliberated for two days and found all of the defendants guilty of the conspiracy to traffic in controlled substances. T. Adams was convicted of conspiracy to commit money laundering, while W. Rhynes, M. Rhynes, and Gormley were acquitted of that charge. Forfeiture judgments in the amount of $1,000,000 were returned against M. Rhynes and W. Rhynes following the guilt phase of the trial pursuant to 21 U.S.C. §§ 853 and 982.
 Defendants all filed motions for judgments of acquittal and for new trials. While these motions for new trials were still pending, the Government learned that one of its witnesses might have gained information about the trial during the trial in violation of the sequestration order. The Government contacted the trial judge, Judge Charles H. Haden II, and briefly discussed the problem with him. Defense counsel were not privy to this conversation. Six days after the Government learned of the allegation, the Government sent a letter to the court and defense counsel detailing the investigation that it had conducted into the matter.
 A hearing on the motions was held. Judge Haden recused himself at this hearing because he had become a material witness. Chief Judge Richard L. Voorhees assumed jurisdiction over the case. After an evidentiary hearing, the district court found that the ex parte communication was not made at a critical stage of the proceedings, and that defendants were not prejudiced by the conversation. Therefore, the district court denied defendants' motions for new trials.
 The district court gave all of defendants managerial role enhancements when he sentenced them. W. Rhynes and T. Adams were sentenced to life terms. M. Rhynes and A. Adams were sentenced to terms of 360 months. Gormley and White were sentenced to terms of 292 months, and McCoy was sentenced to a term of 262 months.
 II.
 Appellants first argue that the district court erred in denying their motions for new trials based on the fact that the Government had a brief ex parte communication with the district court concerning an allegation that arose after trial that one of the Government's witnesses might have violated the district court's sequestration order. We find that the trial court was within its discretion in denying the motions for new trials.
 The allegation came to light nearly two weeks after the close of trial, on October 25, 1996. On that date, Assistant United States Attorney ("AUSA") Robert J. Hidgon ("Hidgon") received notification that Carlos Adams ("C. Adams") had accused one of the trial witnesses, later identified as Andy Stinson ("Stinson"), of violating the court's sequestration order by paying a woman to observe and report the daily activities of the trial. Joint Appendix at 2016. C. Adams also alleged that other witnesses had structured their testimony to be consistent with prior testimony. See J.A. at 2017.
 Higdon contacted IRS Special Agent Floyd Mitchell ("Mitchell"), who had been the lead investigator in this case, and directed him to investigate the allegations. Id. On October 28, 1996, AUSA Hidgon spoke over the telephone to Judge Haden, with AUSA Gretchen Shappert ("Shappert") and Mitchell present in Hidgon's office. Hidgon advised Judge Haden of the situation. J.A. at 2017, 2363-65.
 Mitchell conducted his investigation of the event, speaking to the four individuals mentioned by C. Adams. These individuals, Gary Cannon ("Cannon"), Stinson, Tim Perry ("Perry"), and Scott Lattimore denied all of C. Adams' allegations. See J.A. at 2036-46. In a letter dated October 31, 1996, AUSA Higdon detailed the results of Special Agent Mitchell's interviews and included copies of Mitchell's reports. See J.A. at 1967-70. Defense counsel learned about C. Adams' allegations through this letter. Following the receipt of the letter, many of appellants filed new motions for new trials. Judge Haden recused himself pursuant to 28 U.S.C. § 455(b)(1) due to his personal knowledge of evidentiary facts placed in dispute by the appellants' motions.
 Judge Voorhees acquired jurisdiction over the trial. The district court then held a two-day evidentiary hearing on the matter. Prior to the hearing, Judge Haden testified via a telephone conference call. He testified that the telephone call between him and the Government was two to three minutes in duration. J.A. at 2364. He stated: "I don't recall that we had any substantive conversation about any action that the government would take after -you know, after I was informed of what the problem was, I just said let's -you know, let's notify the defense and we'll take it from there." J.A. at 2363.
 At the evidentiary hearing, C. Adams testified that he had visited with a police officer to discuss a unrelated matter on October 11, 1996. J.A. at 2411. He stated that Cannon asked him if he had been talking to AUSA Shappert. According to C. Adams, when he said no, Cannon walked away. Id. Later, he testified, Stinson approached him and asked him the same question. C. Adams testified Stinson told him he knew it was not Shappert because she was still in trial. J.A. at 2412. C. Adams asserted that he told Stinson that he had been informed that the jury was deliberating. C. Adams testified that Stinson then stated that he paid a woman to sit in the courtroom and report the daily events. Id. C. Adams contended that Stinson made a call to confirm that the jury was deliberating.
 C. Adams also testified that he saw Stinson whispering and talking with others about the instant case. J.A. at 2426-29. He admitted, however, that he did not overhear these conversations, and that he did not know specifically what had been discussed. J.A. at 2426-29, 2439.
 Appellants tried to establish that C. Adams had been truthful in his role as a confidential source for the police. J.A. at 2386-88, 2396-97, 2407-08. Appellants also tried to bolster his claims by producing visitation records and phone records, which indicated that Stinson had made a large number of calls to certain women. J.A. 2487-96, 249601, 2517. Appellants also presented the testimony of their own private investigator, who asserted that he had spoken to many of the women who had been in contact with Stinson. See J.A. at 2512-22.
 After the hearing, the district court denied the motions for new trials. The district court found "that this brief post-trial conversation between the Government and Judge Haden was not `a critical stage of the proceedings.'" Supplemental Appendix Vol. 1 ("S.A.1") at 8 (citing United States v. Cronic, 466 U.S. 648, 659 (1984)). The district court also found that the alleged violation of the sequestration order was not material, and any evidence of it would be merely cumulative or impeaching evidence. S.A.1 at 12-13.
 Appellants now argue that the ex parte communication between the court and the prosecution about C. Adams' allegations deprived the
 defense of timely notice of the violation of the Court's sequestration order; any meaningful opportunity to contest the government's decision to unilaterally investigate its own witness' violation of the Court's order on behalf of the Court;
 and any opportunity to participate or provide input into the investigation of a sequestration order that the Court deemed so important that it had previously removed defense witness Corwin Alexander from the witness stand upon finding an apparent violation.
 Brief for Appellants at 13-14.
 Appellants also argue that they were deprived of the assistance of counsel at a "critical stage" of the proceedings in violation of the Sixth Amendment to the Constitution of the United States. See Cronic, 466 U.S. at 659 ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial."). Appellants argue that the district court erred by holding that the contact did not occur during a critical stage of the proceedings. As motions for new trials were pending during the time that the ex parte communication occurred, they maintain that counsel for defendants should have been present. See Williams v. Turpin, 87 F.3d 1204, 1210 (11th Cir. 1996); Menefield v. Borg et al., 881 F.2d 696, 698-99 (9th Cir. 1989).
 Appellants maintain that the ex parte communication also violated their due process rights under the Fifth Amendment to the Constitution. Further, they claim that the fundamental fairness of the trial was damaged, because the ex parte communication tarnished the appearance of impartiality of the trial.
 Appellants rely primarily on three cases from the Sixth, Third, and First Circuits, United States v. Minsky, 963 F.2d 870 (6th Cir. 1992), Yohn v. Love et al., 76 F.3d 508 (3d Cir. 1996), and Haller v. Robbins, 409 F. 2d 857 (1st Cir. 1969), respectively. In Minsky, Minsky moved for the disclosure of all prior statements of one of the two key witnesses against him pursuant to the Jencks Act, 18 U.S.C. § 3500, during his trial. 963 F.2d at 872. After an in camera review of the routine investigation forms ("FBI 302s"), the court held an ex parte bench conference with the prosecutors to determine if the defense had been made aware of the evidence contained therein which could be used to attack the witness' credibility pursuant to the Jencks Act and to Brady v. Maryland, 373 U.S. 83 (1963).
 The Sixth Circuit found that this ex parte bench conference was a ground for reversal. The court stated that:The ex parte conference in the instant case occurred at a time when the defense was arguing that the FBI 302s were subject to disclosure under the Jencks Act and Brady. The release of this material would have allowed the defense to undermine the credibility of . . . a key government witness. The government has proffered no explanation why the defense was denied an opportunity to participate in a conference at such a critical stage of the proceedings. We refuse to condone conduct that "undermines confidence in the impartiality of the court."
 Id. at 874 (citing United States v. Earley, 746 F.2d 412, 416 (8th Cir. 1984)). The Sixth Circuit held that the ex parte conference violated Minsky's right to a fair trial and his rights under the Sixth Amendment.
 In Yohn, the judge in Yohn's criminal trial originally decided to exclude a tape recording of a wiretap. 76 F.3d at 512. The prosecutor contacted Pennsylvania Supreme Court Chief Justice Robert N.C. Nix, who spoke with the trial judge. Id. at 513. Although the defense counsel was present at that time, he did not participate in the conversation because the judge and the prosecutor were on the two available telephones. Id. at 514. After the conversation with the Chief Justice, the trial judge admitted the tape. Yohn was subsequently found guilty. Id. at 515.
 The Third Circuit found that this ex parte communication had denied Yohn his right to assistance of counsel in a critical stage of the proceedings. The court stated:
 "`Critical stages' are those links in the prosecutorial chain of events in which the potential for incrimination inheres or at which the opportunity for effective defense must be seized or foregone." The only way Yohn's counsel could have effectively defended Yohn's position was to be able to participate contemporaneously in the telephone conversation with the Chief Justice.
 Id. at 522 (citing United States ex rel. Reed v. Anderson, 461 F.2d 739, 742 (3d Cir. 1972)). The court also found that this violation was not a harmless error.
 In Haller, Haller filed a Petition for a Writ of Habeas Corpus, contending that his constitutional rights had been violated when the prosecutor in his case had an ex parte communication with the sentencing judge after his guilty plea. 409 F.2d at 858. The prosecutor informed the sentencing judge of a statement made by the victim concerning Haller's behavior during the commission of the crime. Id. at 859. The First Circuit found that this ex parte communication violated Haller's due process rights. The court held that it was "improper for the prosecutor to convey information or to discuss any matter relating to the merits of the case or sentence with the judge in the absence of counsel." Id. The court further stated that"not only is it a gross breach of the appearance of justice when defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure." Id.
 
 
 1
 Appellants maintain that the instant case is analogous to these three cases in that they did not receive notice of the communication before it occurred, they did not have the opportunity to be heard during the ex parte communication, and the Government has not presented a justification of its decision to proceed ex parte instead of including defense counsel in the conversation. Moreover, appellants contend that their investigation after notification could only be a "tardy rebuttal" as described by Haller. 409 F.2d at 859.
 
 
 2
 We find that the cases relied upon by appellants are distinguishable from the instant case. Yohn and Minsky are distinguishable because the ex parte communications in those cases occurred during trial and had a direct effect on defendants' rights. Haller is also distinguishable because, in that case, the ex parte communication concerned facts about defendant's conduct and were made to the judge sentencing defendant. The communications themselves, in these three cases, went to the merits of the case being presented against those defendants. The ex parte communication in the instant case, however, did not concern the presentation of, or the admissibility of, evidence from the Government's point of view during an ongoing trial. Nor was the Government attempting to shape the sentence imposed by the district judge in any fashion. Instead, the communication merely served to give notice to the district court of a possibility of a violation of its sequestration order.
 
 
 3
 Moreover, Yohn, Minsky, and Haller are distinguishable from the instant case because in this case there was a remedy for any alleged prejudice suffered by appellants due to the ex parte communication. The trial judge recused himself, and appellants were able to investigate the allegations. As a result, appellants called numerous witness at the evidentiary trial, and produced phone records and visitation logs to support the allegations. Moreover, appellants were able to present the testimony of their own private investigator who actually spoke to the women possibly involved. The brief conversation did not hamper their ability to present evidence from their own independent investigation.
 
 
 4
 It may have been better to have the defense counsel made aware of the allegation at the same time that the district court was; however, this was not a situation where the opportunity for effective defense must have been seized or foregone. See Yohn, 76 F.3d at 522. As the district court properly found, "Judge Haden's recusal from the case cured any possible taint that could be inferred." S.A.1 at 8. Appellants were given an opportunity to fully brief their arguments in front of a judge who had had no ex parte contact with either side. Therefore, the ex parte communication in the instant case did not occur at a critical stage of the proceedings, and the constitutional analysis employed by appellants is not applicable.
 
 
 5
 Instead, the true question is whether the district court erred by denying appellants' motions for new trials.
 
 
 6
 In determining whether a new trial should be granted under Rule 33 of the Federal Rules of Criminal Procedure on the basis of newly discovered evidence, this circuit utilizes a five-part test: (i) is the evidence, in fact, newly discovered; (ii) are facts alleged from which the court may infer due diligence on the part of the movant; (iii) is the evidence relied upon not merely cumulative or impeaching; (iv) is the evidence material to the issues involved; and (v) would the evidence probably result in acquittal at a new trial?
 
 
 7
 United States v. Chavis, 880 F.2d 788, 792 (4th Cir. 1989) (citing United States v. Bales, 813 F.2d 1289, 1295 (4th Cir. 1987)). The district court's decision to deny a motion for a new trial is reviewed for an abuse of discretion. See United States v. Singh, 54 F.3d 1182, 1190 (4th Cir. 1995) (citation omitted).
 
 
 8
 Appellants generally must demonstrate that they can satisfy all five of these elements. See id. ("Without ruling out the possibility that a rare example might exist, we have never allowed a new trial unless defendant can establish all five elements."). In the instant case, appellants cannot establish element three. The evidence that Stinson might have violated the sequestration order, if believed, would have been cumulative or impeaching at best. A review of the entire record shows that the defense thoroughly cross-examined the Government's witnesses about the alleged collusion or collaboration with other witnesses. The record also contains allegations on the part of the defense that the testimony of the witnesses had been compromised because they had been housed together, transported together, and held in the same or adjacent cells immediately before or after testifying. Given the weight of the evidence against appellants, and the fact that the jury heard the allegations of witness collaboration, it is unlikely that they would have been acquitted if the evidence of the alleged violation of the sequestration order had been presented.
 
 
 9
 Further, this evidence would be primarily used to attack Stinson's credibility as a witness. However, "[t]his circuit has emphasized that new evidence going only to the credibility of a witness does not generally warrant the granting of a new trial." United States v. Custis, 988 F.2d 1355, 1358 (4th Cir. 1993) (citing United States v. Stockton, 788 F.2d 210, 220 (4th Cir. 1986)).
 
 
 10
 Finally, it is clear that the district court did not find the evidence of a violation of the sequestration order to be believable enough to warrant a new trial. The district court noted that appellants were "unable to point to an instance where any of these government witnesses changed their testimony to comport with that of another government witness." S.A.1 at 11. Further, the district court stated, "[a]s for the testimony of C. Adams, the Court finds that although he appeared to be a disinterested witness, his testimony was neither credible nor significantly corroborated." Id. The district court was in the position to assess the credibility of the witnesses that appeared before it. "In view of its findings as to [C. Adams'] credibility, the district court did not abuse its discretion in denying appellants' motion[s] for a new trial." United States v. Dorlouis, 107 F.3d 248, 254 (4th Cir. 1997).
 
 III.
 
 11
 Appellants next argue that there was insufficient evidence to convict them of the conspiracy to possess with intent to distribute charge. To sustain a jury's finding of guilt, we must look at the evidence in the light most favorable to the Government. United States v. Rusher, 966 F.2d 868, 878 (4th Cir. 1992). When assessing the sufficiency of the evidence of a criminal conviction on direct review, "[t]he verdict of [the] jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). We must also "allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982).
 
 
 12
 As appellants were convicted of drug conspiracy in violation of 21 U.S.C. § 846, the Government had to prove beyond a reasonable doubt that there was "(1) an agreement to possess with intent to distribute the controlled substance named in the indictment existed between two or more persons; (2) that each of defendants knew of the conspiracy; and (3) that each defendant knowingly and voluntarily became a part of the conspiracy." United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996) (en banc).
 
 
 13
 A review of the record shows that the Government presented ample evidence that appellants were involved in a large-scale drug distribution conspiracy, and had used several businesses to facilitate their illegal drug distribution, including W. Rhynes' numerous Big Apple Food Stores, M. Rhynes' Pizza Gallery and Hi-Energy Party Shop, and A. Adams' Little Booker II convenience stores. The first witness called by the Government, James Edward "Ned" Johnson ("Johnson"), testified that he operated three drug houses, and that W. Rhynes had served as his supplier. See J.A. at 292-303. Johnson claimed that he placed property in W. Rhynes' name to bolster W. Rhynes' reputation, and that he invested in businesses recommended by W. Rhynes, some of which were owned or operated by some of the other appellants. See J.A. at 320-49. Johnson also testified that he obtained cutting agents from W. Rhynes' Wilmore area store, which was operated by Gormley. J.A. at 308. Johnson's claims were corroborated by his former girlfriend, Gloria Jean Holloway. See J.A. at 488-91.
 
 
 14
 Theodore Howze ("Howze") testified that he and T. Adams distributed small amounts of cocaine together beginning in 1984. J.A. at 537, 541. He testified that their supplier was A. Adams, and that on numerous occasions he had also obtained quantities of mannitol, a cutting agent, from A. Adams' store. J.A. at 541, 545. He also testified that he had seen T. Adams distribute heroin. J.A. at 550-51. He asserted that T. Adams told him that the supplier of the heroin was W. Rhynes. J.A. at 552. Howze also testified to a single cocaine transaction between himself and W. Rhynes, and to numerous heroin transactions between the two. J.A. at 556, 560-61. Howze further testified that White had supplied him with quantities of heroin. J.A. at 552. Howze also testified that he purchased mannitol and quinine, another cutting agent, from McCoy at M. Rhynes' store, where McCoy worked, and that he also once sold four ounces of cocaine to McCoy. J.A. at 557-58.
 
 
 15
 The Government also called Thomas Douglas ("Douglas"), who testified that he purchased drugs from T. Adams, and that T. Adams had told him that W. Rhynes was the supplier of the drugs. J.A. at 692, 694-95. He also testified that he purchased a cutting agent from the store operated by Gormley. J.A. at 705-708. Douglas testified that White sold him heroin, and that White would purchase heroin from W. Rhynes for his own personal use and also to sell. J.A. 701-705. Douglas also testified that on one occasion he purchased drugs from Willie Marble ("Marble"), who he characterized as a "guy working for" M. Rhynes. J.A. at 710-715.
 
 
 16
 Leroy Huntley, Jr. ("Huntley") testified that he obtained heroin from W. Rhynes in the 1970s. J.A. at 818-20. He testified that in the 1980s, after W. Rhynes had opened his Big Apple Stores on Statesville Avenue and Cliffwood Place, he purchased cutting agents from W. Rhynes at both locations. J.A. at 823-24. He also testified that he bought drugs from White two or three times a day from 1973 to about 1990. J.A. at 826. Huntley also testified that after Melvin Huntley sold him some heroin that was of poor quality, he asked W. Rhynes for a refund, because Melvin Huntley had told him that W. Rhynes was the supplier of the drugs. J.A. at 833. He testified that W. Rhynes gave him a refund for the drugs. Id. He also testified that T. Adams sold him cocaine twice in the 1970s. J.A. at 835. Further, he testified that he was present when T. Adams was robbed and warned the robbers that he was going to tell W. Rhynes about the incident. J.A. at 838.
 
 
 17
 The Government called Shirley Ingram, Jr. ("Ingram"), who testified he traded heroin and marijuana in the mid-1970s with A. Adams until they got into an argument. J.A. at 892-93. He testified that W. Rhynes was often present when these transactions occurred. J.A. at 893. He testified that he sold stolen items to W. Rhynes and McCoy in exchange for drugs. J.A. at 894-95, 899-900. He also testified that T. Adams sold him heroin during the 1980s and 1990s. J.A. at 90204. Further, he stated that from the early 1970s until 1985, and then in the early 1990s, he purchased heroin from White on a daily basis. J.A. at 906-07. He asserted that the heroin he received from White was packaged in the same manner as the heroin he received from W. Rhynes. J.A. at 909.
 
 
 18
 Gary Cannon testified that he was a long-time user of heroin who stole to support his habit. J.A. 921. He asserted that his first supplier of heroin, in the mid 1970's, was Melvin Huntley, who stored the stolen merchandise in one of W. Rhynes' stores. J.A. at 922. He also testified that Melvin Huntley had told him that W. Rhynes was his supplier of heroin. J.A. at 923. Cannon further claimed that White had also been a source for heroin between 1981 and 1990. J.A. at 924. He contended that White had told him that W. Rhynes was his supplier as well. J.A. at 937. Moreover, he asserted that he purchased bags for cocaine and mannitol from one of W. Rhynes' stores. J.A. 929-31. He claimed that he purchased the same type bag, along with other drug paraphernalia, from McCoy at M. Rhynes' Party Shop. J.A. at 931-33. Cannon also testified that in the 1980s he began purchasing cocaine for personal use from T. Adams. J.A. at 934-35.
 
 
 19
 Ricky Rivers ("Rivers") testified that he developed a relationship with W. Rhynes in which Rivers would bring in merchandise obtained through credit card fraud, and W. Rhynes would pay him for the merchandise. J.A. at 977-83. He stated that on the fourth transaction, W. Rhynes showed him a plastic bag filled with cocaine base, and told him that he could make more money selling the drug. J.A. at 983. Further, River claimed that A. Adams and M. Rhynes were present when W. Rhynes later showed him a briefcase filled with drugs and money. J.A. at 986, 988-90.
 
 
 20
 Joe Richardson ("Richardson") testified that he had been a member of two drug organizations, and that W. Rhynes, in their first deal, bought one ounce of cocaine from his partners and himself, after checking the purity of the product. J.A. at 1083-86. He asserted that they had numerous transactions after that instance, but he was not W. Rhynes' primary source of cocaine. J.A. at 1087-91. He further testified that he acted as the middleman between W. Rhynes and a source named Jesse. J.A. at 1091. He claimed that W. Rhynes asked him to look for a source for heroin as well. J.A. at 1094.
 
 
 21
 The Government also called Patricia Paige ("Paige"), who described her long-term addiction to heroin. See J.A. at 1136-37. She admitted that she had a personal friendship and a drug relationship with T. Adams. J.A. at 1137. She testified that on three occasions she accompanied T. Adams to one of W. Rhynes' stores to get heroin. J.A. at 1138, 1141-44. She also testified that T. Adams told her that W. Rhynes was his supplier. J.A. at 1143-44.
 
 
 22
 Diane Corry ("Corry") and Michael Pendry both testified that White sold them heroin in the mid to late 1970s until the 1990s. J.A. at 1170, 1337-42. Corry asserted that White told her that he obtained the drugs from W. Rhynes. J.A. at 1173. She also testified that although she had never seen him distribute drugs, she had seen drugs in T. Adams' house. J.A. at 1176.
 
 
 23
 The Government also called United States Postal Inspector Michael Riddle ("Riddle"), who testified about a controlled delivery he made of an Express Mail Package to the Cliffwood Place Big Apple store on May 5, 1994. J.A. at 1229. He testified that the Postal Inspectors were suspicious of a package addressed to the S&S Food Mart at 1600 Cliffwood Place, and thus had a narcotics dog sniff the package. After the dog did not make its usual response to contraband, the officers decided to deliver the package dressed as mail carriers. J.A. at 1229-30. Riddle admitted that the name of the store at that address was not S&S Food Mart as it was on the label. J.A. at 1231.
 
 
 24
 Riddle testified that he and another officer went into the store. Id. He stated that he told the individual behind the counter that he had a package, and that the individual signed for the package. Id. Afterwards, Riddle identified himself as a police officer and the individual opened the package revealing the cocaine and heroin inside. J.A. at 1233, 1236-37.
 
 
 25
 Officer James Kolbay testified that after the controlled delivery of the package, a consensual search of the Cliffwood store occurred, which uncovered drug paraphernalia including rolling papers, scouring pads, razor blades, plastic and glassine bags, glass stems, digital scales, mannitol, and weapons. J.A. at 1253-71, 1274-76, 1292-1305. Officer Charles H. Witherspoon, Jr. ("Witherspoon") testified that he was standing outside of the store while it was being searched. J.A. at 1294. Witherspoon stated that Gormley drove up,"carrying a black handgun . . . in a shooting position, pointing to his left side," and approached the store. J.A. at 1295.
 
 
 26
 Witherspoon testified that he and the other investigators present pulled their weapons, identified themselves as police officers, and told Gormley to put the weapon down. Id. Gormley did so, retrieved a black briefcase from his car, and then submitted to a pat down search. Id. During this search, Witherspoon testified, he took three weapons from Gormley. J.A. at 1296. Witherspoon also testified that he found "a small corner bag of cocaine residue" inside the briefcase. J.A. at 1300. Advertisements for mannitol and numerous business cards were in the briefcase as well. J.A. at 1302-04.
 
 
 27
 Officer John Collins ("Collins") testified about an incident that occurred with defendant White on March 7, 1994, in which he seized twenty-seven glassine bags of heroin from White. J.A. at 1310-15. Collins also testified that he seized forty-four bags of heroin on October 25, 1994 from White. J.A. at 1315-30. Collins gave his opinion, as an officer who had investigated over a thousand heroin cases, that the forty-four bags of heroin seized were packaged for sale, not personal use. J.A. at 1319-22. On cross-examination, Collins admitted that he did not see White selling the drugs to anyone. J.A. at 1323.
 
 
 28
 Officer James Michael Hart testified that on July 7, 1994, he had seized drug paraphernalia and two weapons from Hi-Energy Party Shop, a business originally owned by M. Rhynes that was later sold to McCoy. S.A.1 at 190-220. He also testified as to the use of the different items of paraphernalia found in the store. S.A.1 at 190-220.
 
 
 29
 Andy Stinson testified as to his relationship with W. Rhynes, M. Rhynes, and Lester McCoy. He contended that he began using W. Rhynes as a supplier in 1989. J.A. at 1360. He also testified that he had, on one occasion, provided two ounces of cocaine to W. Rhynes on credit, and on approximately four occasions in 1989 and 1990, W. Rhynes provided cocaine on credit to Stinson. See J.A. at 1363-65. Further, Stinson claimed that he had purchased approximately two and one-half kilograms of cocaine from M. Rhynes. J.A. at 1368. Stinson also testified that he rented the store to W. Rhynes in which M. Rhynes opened the Hi-Energy Party Shop, and that drug paraphernalia was sold from the store in the 1980. J.A. at 1369-70, 1372.
 
 
 30
 Marvin Marco Graham ("Graham") testified that he began working in A. Adams' convenience store in 1986, cleaning, running the cash register, ordering stock, and running errands. J.A. at 1486-87. He asserted that one of these errands was to go to a store called Tape City to pick up packages of cutting agents for A. Adams. J.A. at 1487. He testified that he saw White and A. Adams processing heroin. J.A. at 1489-90. Graham also testified that A. Adams told him that W. Rhynes was his supplier of heroin. J.A. at 1491. He testified that he would often accompany A. Adams to W. Rhynes' Statesville Avenue Big Apple Store, where A. Adams and W. Rhynes would meet in W. Rhynes' office. J.A. at 1491. Graham stated that A. Adams would leave the office carrying a paper bag, which A. Adams would give to him to hold while A. Adams' drove. J.A. at 1493. He testified that on one occasion, A. Adams told him: "if the police stopped or got behind us or anything, for me to jump our of the van and run with the bag and whatever I did with it, don't throw it down." Id. Graham testified that he began selling cocaine for A. Adams in 1989 or 1990. J.A. at 1494. He further testified that he witnessed a transaction between Kent Wallace ("Wallace") and M. Rhynes at M. Rhynes' Pizza Gallery. J.A. at 1504-1506. Graham also testified that he purchased drug paraphernalia from McCoy at the Party Shop. J.A. at 1503-04.
 
 
 31
 Manning Sweat, III testified that he went to A. Adams' store on a daily basis to purchase mannitol. Id. He stated that he began conducting drug transactions with A. Adams in 1990, supplying the latter with cocaine. J.A. at 1595-97. He stated that he had a conversation with A. Adams in which the latter told him that he needed to sell heroin instead of cocaine. J.A. at 1599. He stated that he never conducted any heroin deals, and that he and A. Adams eventually stopped conducting business after A. Adams did not pay him the full amount for some of the cocaine that he supplied. J.A. at 1599-1600. He also testified that he bought drug paraphernalia from McCoy at the Party Shop. J.A. at 1602.
 
 
 32
 Kenny Funderburk testified that he supplied powder cocaine to M. Rhynes from 1988 until 1992. J.A. at 1626-31. He also testified that M. Rhynes was also a supplier of cocaine to others. J.A. at 1631. He stated that on one of their frequent trips to Washington, D.C., M. Rhynes told him that there may possibly be a cheaper source of cocaine for him. J.A. at 1632. Further, he testified that he had given three kilograms of cocaine to M. Rhynes on credit, and when it was time for him to pay, M. Rhynes paid for two but told him he could not pay for the third until Stinson paid M. Rhynes. J.A. at 1633-34. He testified that although he was eventually paid for this deal, M. Rhynes later did not pay for another deal, claiming that he had been robbed. J.A. at 1634. He stated that he stopped doing business with M. Rhynes because of this incident. J.A. 1634-35.
 
 
 33
 D.S. Davis, Jr. testified that he was a sometime user of drugs, who sold drugs in Charlotte in 1987 or 1988. J.A. at 1692. He testified that he twice approached Corwin Alexander, a friend of M. Rhynes, and asked Alexander if he would talk to M. Rhynes about allowing him to have some cocaine on credit. J.A. at 1696-99 He stated that he contacted M. Rhynes directly, and they conducted four drug transactions. J.A. at 1697-04. He also testified that he purchased bags and cutting agents from M. Rhynes and McCoy at the Party Shop in late 1990 to early 1991. J.A. at 1706-07.
 
 
 34
 Lester Norman, Jr. ("Norman") testified that M. Rhynes was one of his suppliers of cocaine beginning in 1990 and continuing until his arrest in 1992. J. A. 1735-38. He testified that he and M. Rhynes never exchanged the drugs for the money at the same time because "if something else was to happen, we wouldn't get caught with the money and the drugs." J.A. at 1741. He also testified that he purchased cutting agents from the Party Shop. J.A. at 1741.
 
 
 35
 Charles Ivey testified that he witnessed Norman and M. Rhynes conducting drug transactions, after which he and Norman would then sell the purchased drugs. J.A. at 1771-1773. He also testified that he was present when Norman purchased cutting agent from M. Rhynes and from McCoy at the Party Shop. J.A. at 1775-77. He further stated that he was present when Tim Perry picked up cocaine from T. Adams. J.A. at 1777-78.
 
 
 36
 The Government also called Timothy Perry, who testified that T. Adams became his supplier of mostly powder cocaine and occasionally crack cocaine in the late 1980s. J.A. at 1834-36. He further stated that he purchased mannitol for T. Adams, and that T. Adams showed him how to cut cocaine with the mannitol. J.A. at 1838-39. He stated the he also purchased the cutting agent from W. Rhynes. J.A. at 1839. He stated that he once saw T. Adams with heroin. J.A. at 1842-43. Further, he testified that he purchased drug paraphernalia from M. Rhynes' Pizza Gallery from McCoy in the early 1990s. J.A. at 1844-45.
 
 
 37
 Tyran Hicks ("Hicks") testified that he had purchased drug paraphernalia from the Party Shop, although he did not know that M. Rhynes "was affiliated with" it at first. J.A. at 1876. He stated that he had been told that he resembled M. Rhynes, and that he met Rhynes in 1991, after he opened a body and repair shop as a front for his own drug activities. J.A. at 1875, 1877. He stated that M. Rhynes and his friend Corwin, stopped by his shop, and that he discussed with M. Rhynes "what [sic] was a good bondsman and a good lawyer." J.A. at 1878. He also testified that on another occasion, he stopped by the Party Store and discussed the drug trade, especially heroin, in the Charlotte area. J.A. at 1879. Further, he contended that after he asked M. Rhynes about cocaine, the latter gave him Wallace's phone number, and as a result Wallace and Hicks "made a small drug transaction." J.A. at 1880. He stated that M. Rhynes often referred him to Wallace. J.A. at 1886. He also testified that he once had a conversation with M. Rhynes and W. Rhynes, in which W. Rhynes told him that he could make better money if he would dealing with W. Rhynes. J.A. at 1884. He testified that he never did any deals with W. Rhynes, and that W. Rhynes made a veiled threat against him because he was "selling drugs in the complex in the back of [W. Rhynes'] store. . . ." J.A. at 1885. He also testified that he bought drug paraphernalia from McCoy at the Party Shop in 1993 and 1994. J.A. at 1887.
 
 
 38
 Finally, the Government called Michael Pahutski, who testified about his connection to W. Rhynes, M. Rhynes, Gormley, and McCoy. He testified that he had a bookkeeper-client relationship with these defendants, preparing the books, profit and loss statements, payroll ledgers, and the tax returns for their respective businesses. S.A.1 at 26-29. He testified that W. Rhynes, Gormley and McCoy requested that he inflate the numbers so that their business would show a profit and no suspicion would be raised by the Internal Revenue Service. J.A. at 65-68. Pahutski also testified that he saw mannitol in the numerous businesses, and that he had a conversation with McCoy about other drug paraphernalia. S.A.1 at 68-70. He stated that he started using and distributing cocaine in 1992 and was supplied by McCoy. S.A.1 at 70-72. He also testified that he purchased drug paraphernalia, such as a grinder and scales at the Party Shop from McCoy. S.A.1 at 72-73. Further, Pahutski testified that he purchased cocaine from Gormley, for almost a year. S.A.1 at 73-74.
 
 
 39
 Appellants vigorously cross-examined the Government's witnesses at trial, questioning their credibility and motives for testifying. Nonetheless, the jury convicted defendants. Appellant M. Rhynes argues that viewed in the light most favorable to the Government, the evidence only shows that he engaged in buyer-seller transactions, and "if [he was] conspiring at all, [he] was conspiring against a co-defendant and not aiding the charged conspiracy." Brief for Appellants at 23. Appellant Gormley argues that there was no evidence that he trafficked in marijuana and crack cocaine, and little evidence, other than Pahutski's testimony about Gormley's personal use of cocaine and the controlled delivery, that connects him to cocaine and heroin. Appellant White maintains that the evidence merely establishes that he was a heavy drug user, who sold heroin to support that habit. Appellant McCoy argues that the evidence only established that he had a legitimate employer-employee relationship with the Rhynes, but did not demonstrate that he was a member of a conspiracy. The other appellants join in the argument that the Government did not establish that they were members of a drug conspiracy beyond a reasonable doubt.
 
 
 40
 Appellants also rely upon a decision from the Tenth Circuit, United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), which held that witness testimony should be excluded where the witness is promised anything of value in exchange for his or her testimony. This decision has been subsequently rejected and vacated en banc. Furthermore, a number of circuits have rejected Singleton's analysis. See e.g., United States v. Haese, 162 F.3d 359 (5th Cir. 1998), cert. denied, 119 S.Ct. 1795 (1999); United States v. Ware, 161 F.3d 414 (6th Cir. 1998), cert. denied, 119 S.Ct. 1348 (1999). There is no precedent from this circuit to support appellants' position that we should not consider the evidence of the Government's cooperating witnesses in making our determination of whether there was sufficient evidence to convict these defendants.
 
 
 41
 Circumstantial evidence, including a defendant's "relationship with other members of the conspiracy, the length of this association, his attitude, conduct, and the nature of the conspiracy," may be used to prove the existence of and the participation in a conspiracy. United States v. Brown, 856 F.2d 710, 711 (4th Cir. 1998). Further, "[t]o sustain [a] conspiracy conviction, there need only be a showing that [the] defendant knew of the conspiracy's purpose and some action indicating his participation." United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir. 1984). Viewed in the light most favorable to the Government, there is substantial evidence in the record from which a reasonable finder of fact could have determined that a drug conspiracy existed. After there has been a showing that a conspiracy exists, only a slight connection between defendant and the conspiracy need be established in order to sustain the conviction. See United States v. Seni, 662 F.2d 277, 285 n.7 (4th Cir. 1981). Drawing reasonable inferences from the facts presented to it, such as the familial and business relationships between defendants, the jury could find that defendants were knowingly and voluntarily involved in that conspiracy. Thus, we affirm the trial court's denial of appellants' motion for judgment of acquittal based upon the insufficiency of the evidence.
 
 IV.
 
 42
 Appellant M. Rhynes next argues that the district court abused its discretion in striking the testimony of one of his witnesses, Corwin Alexander. Alexander testified that he was M. Rhynes' best friend. J.A. at 1945C. He spoke about M. Rhynes' involvement with W. Rhynes' businesses. J.A. at 1945G-J. Further, he testified about his knowledge of one of the Government's witnesses, D.S. Davis. He stated that Davis asked him about obtaining some drugs, and he told Davis that he was not involved with drugs at all. J.A. at 1945K. He stated that Davis informed him that Davis was a drug dealer. Id. He also testified about having a conversation with Davis about the amount of time Davis was facing after he was arrested. J.A. at 1945L. He stated that Davis told him that, even though he did not have any incriminating evidence against M. Rhynes, the authorities wanted him to implicate M. Rhynes, or he would face more time in prison. Id. While discussing this conversation, Alexander made a statement that indicated to the Government that he had heard about Davis' prior testimony. See J.A. at 1945.
 
 
 43
 The Government promptly objected and asked to approach the bench. At the bench conference, Michael Scofield, counsel for M. Rhynes, told the district judge that he had discussed Davis' testimony with Alexander. He stated, "I specifically told him about that testimony and told him I was going to ask him about that, Your Honor. And I don't think that violates the sequestration order." J.A. at 1945M. The district court judge indicated that he believed that the sequestration order had been violated. Counsel for M. Rhynes stated that he discussed the testimony in order to prepare Alexander to testify, as Davis had accused Alexander of being a drug dealer as well. Id. The Government moved to exclude the testimony of Alexander. The district court judge stated that he found the conduct of M. Rhynes' counsel to be unprofessional, and excused the witness. J.A. at 1945M-N. The judge then told the jury to disregard the testimony that had been offered by Alexander. The judge did not conduct a voir dire examination of Alexander before excusing him.
 
 
 44
 After the afternoon recess, counsel for M. Rhynes requested another bench conference. J.A. at 1945P. At this bench conference, counsel made a proffer of the testimony that Alexander would have given because the judge had indicated that he would not revisit his decision to strike Alexander's testimony. Counsel for M. Rhynes stated that Alexander would have testified that he never dealt drugs, and that he knew Davis well enough to form the opinion that Davis was untruthful. Id. Further, Alexander would have provided corroboration for M. Rhynes' testimony about an automobile accident and an insurance settlement, which would provide a legal explanation for what the Government had presented as M. Rhynes' "unexplained wealth." Counsel for M. Rhynes also indicated that Alexander would have challenged Howze's testimony about his dealings with M. Rhynes, and would have offered his opinion that Stinson, Funderburk, Norman, Harrison, and Hicks were untruthful. J.A. at 1945R-S. Further, counsel for M. Rhynes indicated that Alexander would have explained that the purpose of a 1994 trip taken by himself and M. Rhynes had nothing to do with the drug trade, and would have corroborated other details about M. Rhynes' life. J.A. at 1945S. The district court judge decided to not revisit the issue. J.A. at 1945T.
 
 
 45
 M. Rhynes argues that his counsel had the duty to investigate and interview witnesses prior to presenting their testimony. Counsel for M. Rhynes claims that he discussed Davis' allegation that Alexander was a drug dealer with Alexander "to determine (1) if Alexander would invoke the Fifth Amendment if confronted on the stand with the Davis allegation; (2) if Alexander's expected denial of such involvement was credible and (3) what relationship had existed between Alexander and Davis that might prompt such a false allegation by Davis." Brief for Appellant at 34. M. Rhynes contends that it would have been a poor defense strategy for his counsel to call a witness knowing that witness would invoke the Fifth Amendment. See Chandler v. Jones, 813 F.2d 773 (6th Cir. 1987).
 
 
 46
 Moreover, M. Rhynes contends that his counsel's interview of Alexander did not violate Federal Rule of Evidence 615 or the district court's instructions regarding the sequestration order it was granting. Rule 615 provides:
 
 
 47
 At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.
 
 
 48
 When the court granted the defense's motion for sequestration, the district court stated:
 
 
 49
 THE COURT: Well, I do grant the usual sequestration rule and that is that the witnesses shall not discuss one with the other their testimony and particularly that would apply to those witnesses who have completed testimony not to discuss testimony with prospective witnesses, and I direct the Marshal's Service, as much as can be done, to keep those witnesses separate and apart from the witnesses who have not yet given testimony who might be in the custody of the marshal.
 
 
 50
 J.A. at 273-74. The district court exempted the Government's case agent and summary witness, and defendants' investigator, "[s]o long as [he] observe[d] Rule 615 and [did] not talk to the witnesses about testimony that has just concluded or testimony that has concluded." J.A. at 275. The district court required the defense to make a representation that the investigator would not talk to the witnesses.
 
 
 51
 M. Rhynes contends that neither Rule 615 nor the court's order indicates that his counsel could not conduct the interview of Alexander as to Davis' allegations. He further cites a leading treatise for the proposition that "[if] exclusion is ordered, the witnesses should be instructed not to discuss the case among themselves or with anyone except counsel for either side." 2 Charles A. Wright, Federal Practice & Procedure § 415 (2d ed. 1982). M. Rhynes also argues that "[i]f defense counsel, actively fulfilling his constitutional function, is to be prohibited from such an interview with his own key witness, there must be a specific directive by the trial court to prohibit what would otherwise be a normal and expected Sixth Amendment obligation." Brief for Appellants at 36. See Geders v. United States, 425 U.S. 80, 87 (1976) (forbidding a sequestration order that prohibited a defendant-witness from conferring with his counsel). M. Rhynes contends that if the court wanted defense counsel to not speak to witnesses about prior witness testimony, it could have made this known as it did with defense's investigator.
 
 
 52
 These arguments fail to persuade us to overturn the district court's decision. An appellate court is obliged to allow district courts discretion to preserve the integrity of a trial. Substantial deference is due a district court's evidentiary rulings and reversal may occur only where there has been an abuse of discretion. General Elec. Co. v. Joiner, 522 U.S. 136, 141 (1997). This deference is especially appropriate where, as here, the district court's actions are designed to protect the truthfulness of testimony. As the Supreme Court has stated, "If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings." Geders, 425 U.S. at 87.
 
 
 53
 The judicial system as a whole has a global interest in protecting the truth-finding process. Conduct such as witness coaching and perjury threatens to destroy the integrity of this process. The risk of this type of conduct inhered in the circumstances of this case. This was a multi-defendant conspiracy with the potential for a variety of conflicting stories from the respective defendants. We cannot say that the district judge was unreasonably on heightened alert to the risks of tailoring. Nor can we say that his actions to combat these risks were unreasonable.
 
 
 54
 The sequestration order was drawn to ensure that there was no witness coaching, collusion among witnesses, or tailoring of testimony. While cross-examination plays an important role in preventing these ills, it may not be the complete answer. In fact, the very availability of a sequestration order under Fed. R. Evid. 615 reflects the judgment of the drafters that cross-examination may not be wholly sufficient to safeguard the truth-finding function in all circumstances.
 
 
 55
 Further, Rule 615 is not the limit of a district court's supervisory authority over the conduct of a trial. See United States v. Sepulveda, 15 F.3d 1161, 1176 (1st Cir. 1993). The court may take additional measures to prevent the tailoring and fabrication of witness testimony, such as prohibiting witnesses from discussing the case with one another, from discussing the case with any attorney, and from reading transcripts of the trial testimony of other witnesses. See Michael Graham, Federal Practice and Procedure, Federal Rules of Evidence § 6611, at 216-18 (interim ed. 1992).
 
 
 56
 Although the dissent challenges the district court's interpretation of its order, district courts are best able to interpret their own orders. See Vaughns v. Board of Educ. of Prince George's County , 758 F.2d 983, 989 (4th Cir. 1985). We have noted that district courts are entitled to "inherent deference" when they construe the same. Anderson v. Stephens, 875 F.2d 76, 80 n.8 (4th Cir. 1989). Indeed, reversal of a district court's interpretation of its own order may occur only when "the record clearly shows an abuse of discretion." Texas N. W. Ry. Co. v. Diamond Shamrock Ref. & Mktg. Co. (In re Chicago, Rock Island & Pacific R.R. Co.), 865 F.2d 807, 810 (7th Cir. 1988) (internal quotation marks omitted).
 
 
 57
 Here the district court's interpretation of its order was a reasonable one. The purpose of a sequestration order "is, of course, to prevent the possibility of one witness shaping his testimony to match that given by other witnesses at the trial." United States v. Leggett, 326 F.2d 613, 613 (4th Cir. 1964). Given the danger of tailoring, allowing an attorney to inform a witness of other witnesses' testimony poses the exact same risk as allowing witnesses to speak with one another. If the attorney is permitted to convey the same information that a witness was not allowed to obtain from another source, then the sequestration order may be effectively nullified. The district court was thus within its discretion to interpret its order in a manner that prevented the defense from undermining the very purpose of that order. Even were we to think, as the dissent does, that the district court's interpretation resulted in an "overbroad" sequestration order, that would still not suffice to undermine the district court's reasonable attempt to ensure the integrity of the proceedings before it.
 
 
 58
 The dissent complains that neither Rule 615 nor the district court's order barred any attorney from speaking with any witness. But as stated above, the district court properly exercised its discretion to interpret its order in light of the order's manifest intent. The fact that the text of the order may not have expressly mentioned attorneywitness communications does not alter this conclusion. In fact, other circuits have recognized that a sequestration order may cover more than courtroom exclusion even if the order mentions only exclusion. See, e.g., United States v. Greschner, 802 F.2d 373, 375 (10th Cir. 1986) (Rule 615 also prohibits discussion of case between witnesses); Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1373 (5th Cir. 1981) (Rule 615 prohibits the reading of trial transcripts). These cases recognize that trial judges are entitled to be on alert to the myriad ways in which individuals may attempt to circumvent sequestration orders.
 
 
 59
 Moreover, the district judge did not find a violation of the order simply because defense counsel spoke generally about the case with a witness who was yet to testify. Rather, the district judge sanctioned the defense because the attorney had conveyed precisely that information which the sequestration order was designed to withhold from prospective witnesses -namely, the testimony of prior witnesses in the case.
 
 
 60
 It would undoubtedly benefit every defense witness to know what a prosecution witness had or had not said on the stand. This is especially so where, as here, a prosecution witness has linked the defense witness to the defendant's own alleged illegal activities. A defense witness equipped with this specific knowledge has an opportunity to tailor his testimony to respond more convincingly to such allegations.
 
 
 61
 In this case, Alexander and M. Rhynes stood to gain much from Alexander's knowledge of Davis' testimony. Davis was the single most problematic witness from Alexander's point of view. Not only did Davis testify that M. Rhynes was a drug dealer, but he also linked Alexander with M. Rhynes' drug dealing. Davis testified that he asked Alexander on several occasions to help him procure cocaine from M. Rhynes. Moreover, Davis testified that Alexander in fact served as an intermediary between Davis and M. Rhynes after these conversations. Alexander was put on the stand by M. Rhynes to offer exculpatory testimony at odds with Davis' inculpatory testimony. Alexander was also likely to be confronted with Davis' allegations that Alexander himself was involved in M. Rhynes' drug business. It is clear that Alexander could be more specific, more credible, and more forceful in his denials of both M. Rhynes' guilt and his own participation in the drug business if Alexander knew beforehand the details of Davis' testimony. Knowledge of Davis' prior testimony would enable Alexander to ensure that his words on the stand dovetailed comfortably with parts of Davis' account while denying those parts of Davis' testimony which incriminated Alexander. If Davis' testimony could be explained away, then Alexander would be free from the main difficulty plaguing his efforts to exculpate M. Rhynes. Thus, when it came to light that Alexander had been alerted to Davis' prior testimony, the district judge was obviously disturbed by this disclosure and within his rights to remedy it.
 
 
 62
 The dissent does not deny that M. Rhynes and Alexander both stood to gain greatly from Alexander's awareness of Davis' testimony. The dissent also does not deny that Scofield's actions accomplished the very result that the sequestration order was designed to prevent -namely, one witness' knowledge of the testimony of a prior witness before the later witness had taken the stand. Yet the dissent believes that it was perfectly acceptable -indeed commendable -for Scofield to relate Davis' testimony to Alexander.
 
 
 63
 This belief rests, however, on a series of non sequiturs that ring false alarms concerning our holding today. Contrary to the concerns expressed by the dissent, counsel had ample room to interview and prepare witnesses without running afoul of the order. The dissent makes much of Scofield's attempts to justify his actions to the district judge. Scofield asserted: "And I don't think[specifically telling Alexander about Davis' testimony] violates the sequestration order. . . . I've done wrong then because I don't know how else I can prepare him to testify." Not only are these pleas not dispositive of the issue, but they are also at odds with Scofield's later views.
 
 
 64
 Scofield himself refutes the dissent's argument that the district judge "prevent[ed] lawyers from lawyering" and that we "hamstring[ ] attorneys in performing their obligations to competently defend their clients" by our ruling today. After reflecting upon his actions, Scofield not only apologized to the court, but he also commendably related in detail what he could have and should have done instead. Scofield told the judge at a bench conference after his violation came to light:
 
 
 65
 Your Honor, as I told you in chambers, I now realize that the proper thing for me to do in interviewing Alexander and preparing him to testify was that I could have asked him all the details of whether he had been a dealer and whether he had done drug deals with Michael Rhynes and that sort of thing without telling him that Davis had said that he had done that.
 
 Scofield went on to say:
 
 66
 I wanted to specifically ask him about his relationship with D. S. Davis. And as I told the court, I did tell him that D. S. Davis had said that he had done these drug deals and that I wish I had been more alert in drawing that line about just asking the questions without saying what D. S. Davis had said in the court.
 
 
 67
 Scofield has thus already allayed the dissent's concern that he have ample room to prepare his witness and discharge his duties to his client competently without violating the district judge's order. The prosecutor and district judge had even less difficulty recognizing that "the highest and best traditions of lawyering" could be upheld without violating the sequestration order. For example, the prosecutor indicated his understanding of what would have been proper behavior on Scofield's part by saying: "Seems to me the proper way to prepare the witness is the way the government prepared. We ask what they know. We don't tell them what went on in the courtroom."
 
 
 68
 The dissent nonetheless alleges that our claim that counsel could have performed his duties without violating the order somehow constitutes a "logical fallacy" and "begs the question, `How was counsel to discern the limits of the sequestration order?'" The answer to this supposedly begged question, however, is straightforward. If Scofield had any doubt about the propriety of his intended conduct, he could have asked the district judge whether he was permitted to inform Alexander of Davis' prior testimony. Seeking clarification of the propriety of his proposed course of action in advance would have been preferable to violating the order by conduct that utterly thwarted the order's purpose. In the law, it is not usually true that it is better to ask forgiveness than permission.
 
 
 69
 Indeed, in attempting to justify the attorney's conduct in this instance, the dissent simply undermines the ability of district judges to run a trial. The dissent applies the most stringent canons of statutory construction to a district court's orders and labels any deviation from these canons a violation of ex post facto principles. In doing so, it unduly absolves attorneys of their own responsibility, along with the court, to ensure the proper conduct of a trial. If the dissent's position were to prevail, the scenario before us today would be repeated many times -namely, attorneys would construe court orders in the most permissive light and protest any violations with the narrowest interpretation of the district court's instructions. This is a recipe for stripping control of court proceedings from presiding judges. A sequestration order is "a product of common sense and its purpose is obvious." United States v. McMahon, 104 F.3d 638, 644 (4th Cir. 1997). Both attorneys and trial judges bear responsibility for its proper implementation. The point here is not to excoriate Scofield or any other attorneys, who perform a vital role in our adversary system, but rather to reinforce the proper roles of attorneys and judges. The abuse of discretion standard on appellate review mandates that, in the final analysis, a district court's reasonable interpretation of its own trial orders must be credited.
 
 
 70
 The dissent's invocation of Scofield's resume and MartindaleHubbell rating as justification for his actions is mystifying, to say the least. The dissent claims that "[n]or is it insignificant that Mr. Scofield did not understand `the usual sequestration rule' to bar counsel from discussing prior trial occurrences with an upcoming witness" -then supplies a laudatory description of Scofield's professional background. If anything, the revealing of prior testimony to a prospective witness on the part of an experienced attorney would be less excusable than the mistake of a novice. But the dissent improperly focuses on who Scofield is rather than on what Scofield has done. The district court, in contrast, properly focused on the attorney's conduct and not on the resume and rating he brought to trial. The law is no respecter of persons. And the district court was correct not to base its decision on the length of an attorney's experience or on the trajectory of his professional career.
 
 
 71
 The dissent's emphasis on the defense attorney's resume is more than just an incidental point. It in fact turns the whole matter of deference on its head. Our deference is owed the district court, not the defense attorney. And the comparative resumes and experience that a district judge or counsel may bring to a proceeding are quite beside the point. Our deference belongs to the district court because it is the district judge who occupies the sole position of impartiality in a hotly contested proceeding and because it is the district judge who ultimately is charged with making sure trial proceeds in an honest and truthful manner. The giving of tailored testimony strikes at the very heart of the trial judge's charge and it is not reasonable to expect him to sit passively while the truth of witness testimony is placed in jeopardy. See, e.g., Nix v. Whiteside, 475 U.S. 157, 166 (1986) ("[T]he very nature of a trial [i]s a search for truth.").
 
 
 72
 Nor was the district court's order to exclude Alexander's testimony unreasonable. We have reserved exclusion for exactly those situations in which it is the defendant or his counsel who causes the infraction. See United States v. Cropp, 127 F.3d 354, 363 (4th Cir. 1997). Indeed, there is "no precedent in which we have overturned the decision of a district judge to exclude a defense witness when the violation was plainly the fault of the defendant or defendant's counsel." Id.
 
 
 73
 The dissent relies on Cropp to argue that the district judge's chosen remedy was excessive. In Cropp, however, this court refused to find that the district court had abused its discretion in excluding a witness even though this court would have chosen a lesser sanction as an original matter. Id.; see also United States v. Avila-Macias, 577 F.2d 1384, 1389 (9th Cir. 1978) ("The appropriate sanction for violation of a witness exclusionary rule is a matter which lies within the sound discretion of the trial court."). The district judge believed that exclusion was necessary to prevent M. Rhynes' witness from giving tailored testimony. To reverse on abuse of discretion grounds would impair the necessary latitude trial courts must possess in safeguarding the single most important function of a trial.
 
 
 74
 The dissent nonetheless vaguely alleges that the exclusion order may violate M. Rhynes' Sixth Amendment rights. The Sixth Amendment does afford, of course, protection of the right to present witnesses. But nowhere in the text of the Constitution is there a right to violate a valid district court order with impunity. Nor does the Sixth Amendment prescribe any right for an attorney to tell a witness the details of prior courtroom testimony. The district judge did nothing to hinder the defense from presenting its witnesses until the sequestration order was violated. And as our holding in Cropp demonstrates, once defendant's counsel has caused a violation of the order, the Sixth Amendment does not preclude the trial judge from exercising his discretion to exclude the witness. 127 F.3d at 363.
 
 
 75
 We do not hold, of course, that every judge must conduct a trial in this manner. We do not say that every judge must issue this kind of order, interpret his order in this manner, or impose this sanction. See, e.g., United States v. Shurn, 849 F.2d 1090, 1094 (8th Cir. 1988) ("The trial court is given broad discretion in the interpretation of Rule 615."). It is not our place to substitute wholesale our judgment for that of the district court, for "[t]rial judges are much closer to the pulse of a trial than . . . [we] can ever be . . . ." United States v. Ham, 998 F.2d 1247, 1252 (4th Cir. 1993) (internal quotation marks omitted). Instead, we hold only that the trial judge's actions did not represent an unreasonable response to the risks and demands of a complex, multi-defendant conspiracy case.
 
 
 76
 Moreover, if there was any error in the exclusion of Alexander's testimony, then it is subject to harmless error analysis. See United States v. Farnham, 791 F.2d 331, 335 (4th Cir. 1986) (stating that under Rule 615 "we remain bound by the harmless error rule."). An error by the district court is considered harmless when "we . . . can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Ince, 21 F.3d 576, 583 (4th Cir. 1994) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)). Given the amount of evidence produced at the trial against M. Rhynes, it is unlikely that the jury was substantially swayed by the error.
 
 
 77
 The voluminous testimony against M. Rhynes from individuals who had been directly involved with or familiar with his drug trafficking activities. For example, at least nine witnesses testified to having conducted drug transactions with M. Rhynes on many separate occasions spanning at least half a decade. Another witness testified to observing M. Rhynes conducting a cocaine transaction from his white BMW. Yet another testified that he was with M. Rhynes in New York in 1994 while M. Rhynes was in possession of four kilograms of crack cocaine and one-half kilogram of heroin. These and other witnesses testified to having received drug paraphernalia from M. Rhynes and tied M. Rhynes to the drug trafficking activities of W. Rhynes and Lester McCoy.
 
 
 78
 When one compares the cumulative evidence against M. Rhynes to the difference that Alexander's testimony, if believed, could have made, it is clear that any error is harmless. The dissent seems to believe that the characterization of Alexander as M. Rhynes' "sole supporting witness" is talismanic and focuses on M. Rhynes' "lost" opportunity to challenge the government on a number of issues. However, the conclusion that M. Rhynes was therefore"clearly denied his constitutionally protected right to fairly defend himself" does not follow, for the dissent ignores the crucial other side of the equation -namely, the massive inculpatory evidence against M. Rhynes. In light of evidence presented against M. Rhynes, it is unlikely that the judgment was substantially swayed by the exclusion of Alexander's testimony.
 
 V.
 
 79
 Appellant M. Rhynes next argues that if the trial court did not err in striking Alexander's testimony, he received ineffective representation. M. Rhynes acknowledges that "a claim of ineffective assistance should be raised in a 28 U.S.C. § 2255 motion in the district court rather than on direct appeal, unless the record conclusively shows ineffective assistance." United States v. Williams, 977 F.2d 866, 871 (4th Cir. 1992). M. Rhynes argues that as the district court at the trial labeled his conduct as "very unprofessional" and an "absolute breach of the Rule 615," the record conclusively shows ineffective assistance.
 
 
 80
 An ineffective assistance of counsel claim involves a mixed question of law and fact, and therefore no special deference is owed to the district court's findings with respect to such a claim. United States v. DeTemple, 162 F.3d 279, 289 (4th Cir. 1998), cert. denied, 119 S.Ct. 1793 (1999). In order to prove the claim a petitioner must show that (1) counsel made errors so serious that counsel's representation fell below an objective standard of reasonableness, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). This two-part test promulgated by Strickland is also referred to as the "performance" and "prejudice" components. Fields v. Attorney General of the State of Maryland, 956 F.2d 1290, 1296 (4th Cir. 1992) (citation omitted). We will begin with the prejudice prong of the Strickland test because if defendant M. Rhynes cannot demonstrate the requisite prejudice, a reviewing court need not even consider the performance prong. See Luchenberg v. Smith, 79 F.3d 388, 391 (4th Cir. 1995) (citing Strickland, 466 U.S. at 697)).
 
 
 81
 Appellant M. Rhynes contends that the prejudice prong has been met because his attorney's actions caused the exclusion of testimony that was key to his defense. He asserts that given the importance of the testimony of the excluded witness to his defense, there is a reasonable probability that, but for his counsel's error, the result of the proceeding would have been different.
 
 
 82
 Appellant M. Rhynes has failed to demonstrate that as a result of his counsel's error his trial was fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369 (1993). As has been discussed, the Government presented the testimony of several witnesses who testified about M. Rhynes' involvement in various facets of the drug trade. It is true that Alexander could have disputed the testimony of some of the Government's witnesses, and could have offered testimony as to these witnesses' reputation for dishonesty. However, as has been previously discussed, defense counsel had ample opportunity to cross-examine each of the Government's witnesses and to challenge their veracity. Taking all the facts of the three-week trial into account, we cannot find that "but for" counsel's error and "but for" the exclusion of this one witness, defendant would have been acquitted. Therefore, M. Rhynes' ineffective assistance of counsel claim must fail.
 
 VI.
 
 83
 Appellant W. Rhynes argues that the district court erred in denying his motion to suppress the items seized from his home and business properties because the most recent drug trafficking or money laundering activities alleged in the search warrant affidavit were over two years old. We disagree.
 
 
 84
 On January 17, 1996, the Honorable H. Brent McKnight, United States Magistrate Judge, authorized searches of W. Rhynes' residential and business properties. J.A. at 173-177. The search warrants were supported by the applications and forty-page affidavit of Special Agent Mitchell.
 
 
 85
 Agent Mitchell's affidavit summarized information provided by forty-seven cooperating witnesses who implicated defendant W. Rhynes and his six co-conspirators in drug trafficking and money laundering. Acts in furtherance of the conspiracy were alleged by the witnesses to have occurred between 1960 and 1994. The affidavit described the witnesses' knowledge of defendant's drug trafficking activities; the interrelationships between defendant's supposedly legitimate businesses and drug trafficking; the distribution of drug paraphernalia and quantities of "cut" in furtherance of drug trafficking; the laundering of drug proceeds through defendant's businesses; and the preparation and use of fraudulent tax returns to obtain bank loans and to justify the purchase of assets and the flow of currency not otherwise explainable in the legitimate course of defendant's businesses. Finally, the affidavit indicated that the individuals who prepared fraudulent tax returns and records on behalf of defendant did so by receiving documents and papers which defendant maintained at the respective places of business which were the subject of the search warrants. J.A. at 185-218.
 
 
 86
 Defendant's Motion to Suppress was filed on May 5, 1996. J.A. at 163-171. The Government responded on June 18, 1996. J.A. at 231-245. In a Memorandum and Recommendation filed by the Honorable Carl Horn, United States Magistrate Judge, on July 1, 1996, the court found that the facts in the case were not substantially in dispute. The Magistrate Judge recommended the denial of defendant Rhynes' motion, and found that the information contained in Agent Mitchell's affidavit was sufficient to support a finding of probable cause. J.A. at 246-259. In an Order filed July 22, 1996, the district court adopted the Magistrate Judge's Memorandum and Recommendation by reference and denied defendant's motion. J.A. at 260-261.
 
 
 87
 W. Rhynes argues that the district court erred by adopting the Magistrate Judge's Memorandum and Recommendation. It is well settled that the district court's rulings with regard to the suppression of evidence are subject to de novo review. United States v. Kitchens, 114 F.3d 29, 31 (4th Cir. 1997); United States v. McDonald, 61 F.3d 248, 154 (4th Cir. 1995); United States v. Smith, 30 F.3d 568, 571 (4th Cir. 1994).
 
 
 88
 A valid search warrant may issue only upon allegations of "facts so closely related to the time of issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case." Sgro v. United States, 287 U.S. 206, 210-11 (1932). This circuit has stated that "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." United States v. McCall, 740 F.2d 1331, 1336 (4th Cir. 1984) (quoting United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972)). "Rather, we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." Id.
 
 
 89
 In the affidavit all residences searched were alleged to have been "used to facilitate drug trafficking, money laundering, and filing of false income tax returns." J.A. at 211; see also J.A. at 212-15. In the instant case, the nature of the activities alleged were long-term drug trafficking and money laundering, supported and aided by the operation of seemingly legitimate businesses through which the defendant laundered proceeds and facilitated the distribution of illegal drugs. Moreover, the length of the alleged activity was more than two decades, a decidedly long time for which defendant was accused of engaging in a criminal enterprise. Further, the property to be seized included books, records, notes, ledgers, financial records, records of real estate transactions, bank statements, proceeds of drug sales and address books relating to drug activity, copies of personal income tax returns, passports, and checkbooks.
 
 
 90
 A critical issue regarding staleness is "whether there was probable cause [at the time of issuance of the search warrant] to believe that the evidence was then located at the premises named in the warrant." McCall, 740 F.2d at 1337. In this case, the warrant authorized the police to search for the types of records and personal papers which are not ordinarily destroyed or moved about from one place to another. Therefore, there was probable cause to believe that the business and personal financial records, etc., of defendant would be located at his personal residence and place of business. Therefore, the search warrant was not "stale." Consequently, we affirm the district court's adoption of the Magistrate Judge's Memorandum and Recommendation.
 
 VII.
 
 91
 W. Rhynes next argues that his conviction of possession of a firearm by a convicted felon in violation of 18 U.S.C § 922(g)(1) cannot be sustained because his civil rights had been restored. Section 922(g)(1) reads in pertinent part: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . ." When evaluating whether federal or state law should be applied the choice-of-law clause of that section provides: "What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held." Id. at § 921(a)(20). An exemption is provided for any conviction for which a person has had civil rights restored.[1]
 
 
 92
 In Beecham v. United States, 511 U.S. 368 (1994), the Supreme Court adopted this circuit's holding and determined that the choiceof-law clause of § 922(a)(20) applies to its exemption clause. In Beecham, both petitioners were convicted of violating § 922(g). Id. at 370. Beecham's prior conviction was a federal conviction, while Jones had two prior state convictions and one federal conviction. Petitioners' respective states had restored their civil rights; however, the federal government did not also restore such rights. Id. "Asking whether a person has had civil rights restored is thus just one step in determining whether something should `be considered a conviction.' By the terms of the choice-of-law clause, this determination is governed by the law of the convicting jurisdiction." Id. Thus, the Court held that Beecham and Jones could "take advantage of § 922(a)(20) only if they have had their civil rights restored under federal law. . . ." Accordingly, W. Rhynes can only take advantage of § 921(a)(20) if his civil rights have been restored under federal law.
 
 
 93
 A person who is prohibited from possessing . . . firearms . . . may make application to the Secretary for relief from the disabilities imposed by Federal laws . . . and the Secretary may grant such relief . . . . Whenever the Secretary grants relief to any person pursuant to this section he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.
 
 
 94
 18 U.S.C. § 925(c). In the instant case, the parties stipulated that W. Rhynes had a prior felony conviction. The Secretary of the Treasury's certified record indicated that W. Rhynes' civil rights had not been restored under federal law. W. Rhynes contends that because the restoration of his civil right to vote was determined under North Carolina law, the restoration of his civil right to possess a firearm should also be determined under North Carolina law. However, it is clear that state restoration of civil rights cannot undo the federal disability flowing from a federal conviction. United States v. Jones, 933 F.2d 1131 (4th Cir. 1993), aff'd 511 U.S. 368 (1994). Therefore, in absence of restoration of W. Rhynes' civil rights by the Secretary of the Treasury, his conviction of possession of a firearm by a convicted felon was proper.
 
 VIII.
 
 95
 Next, appellant Gormley argues that his Sixth Amendment right to confront the witnesses presented against him was violated when the district court admitted the testimony of Thomas Douglas and Marvin Graham. As has been discussed, at trial, the Government presented evidence designed to prove that defendant Purvis Gormley was involved in the Rhynes drug organization, and that the Wilmore area Big Apple Store, which Gormley managed, was the scene of many activities in furtherance of that conspiracy. Appellant Gormley has challenged the admission of portions of testimony of two witnesses, Thomas Douglas and Marvin Graham, as prejudicial hearsay. The Government contends that the statements were properly admitted pursuant to Fed. R. Evid. 801(d)(2)(E), which provides a hearsay exception for the statements of a co-conspirator. In the alternative, the Government argues that the admission of said statements was harmless error.
 
 
 96
 Gormley argues that the district court erroneously permitted Douglas to testify that a person named "Ralph" told him that the drugs that Ralph was selling were supplied by Gormley. Douglas stated:
 
 
 97
 Q. Now, have you ever gotten drugs out of the store in Wilmore, the Big Apple?
 
 
 98
 A. Yes, from the guy that used to work in the store named Ralph.
 
 
 99
 Q. And when was that that (sic) you got drugs from him?
 
 
 100
 A. `86 or `87.
 
 
 101
 Q. On how many occasions?
 
 
 102
 A. On a few. He was living in the game room in behind at the Big Apple.
 
 
 103
 Q. Is the game room part of the building?
 
 
 104
 A. Yes, sir.
 
 
 105
 Q. And he was living there?
 
 
 106
 A. Yes, sir.
 
 
 107
 Q. And you got drugs from him. Did you get them from him in the store?
 
 
 108
 A. Yes, sir, I did.
 
 
 109
 Q. Now, do you know who Ralph was getting the drugs from?
 
 
 110
 A. He said Purvis. It was Purvis.
 
 
 111
 Mr. Foster: Objection, hearsay.
 
 
 112
 The Court: Overruled.
 
 
 113
 J.A. at 709 (emphasis added).
 
 
 114
 Gormley also challenges the admission of Graham's testimony regarding the deliveries of drugs to Gormley, on behalf of defendant W. Rhynes, at the store. Graham stated:
 
 
 115
 Q. Okay. Did you and Fats [A. Adams] ever talk about Purvis working at the Big Apple?
 
 
 116
 A. Yes, sir, we did.
 
 
 117
 Q. What did you talk about?
 
 
 118
 A. He just said Will had got Purvis fucked up getting that shit in the mail.
 
 
 119
 J.A. at 1500. Gormley argues that these two statements were "classic, inadmissible hearsay." Brief for Appellant at 50.
 
 
 120
 The standard for reviewing the district court's findings of fact regarding the threshold criteria for admission of statements under the co-conspirator exception is clear error. United States v. Shores, 33 F.3d 438, 442 (4th Cir. 1994). Pursuant to Federal Rule of Evidence 801(d)(2)(E), an out-of-court statement from a co-conspirator, that incriminates the defendant (termed a co-conspirator statement) is admissible in trial if the court finds (i) that the defendant and the declarant were involved in a conspiracy with each other at the time the statement was made; and (ii) that the statement was made in furtherance of that conspiracy. Id.; United States v. Blevins, 960 F.2d 1252, 1255 (4th Cir. 1992).
 
 
 121
 In the instant case, a review of the testimony demonstrates that the witnesses themselves established through their testimony that Gormley and the declarant ("Ralph" in the case of Thomas Douglas; "Fats" in the case of Marvin Graham) were involved in a drug conspiracy with each other. However, the Government did not develop the testimony of these witnesses in order to determine whether the statements were made in furtherance of the conspiracy. The lack of questioning by either the Government or the defense regarding the nature of the circumstances surrounding the alleged conversations renders it unclear whether the statements were made in furtherance of that conspiracy. Even if the statements were not made in furtherance of the conspiracy, and therefore should not have been admitted, however, we find that this does not constitute reversible error.
 
 
 122
 The Government presented ample testimony concerning Gormley's connection to the conspiracy. This testimony included that of Ned Johnson, who testified that he purchased cutting agent from Gormley at the Big Apple store Gormley managed, the testimony of the law enforcement agents concerning the controlled delivery to that store and the weapons and drugs found on Gormley at that time, and the testimony of Michael Pahutski concerning his business and drug relationship with Gormley. We can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed" by any error in admitting the statements. Brooks, 111 F.3d at 371. Therefore, if the district court erred, it was harmless error.
 
 IX.
 
 123
 Appellant White asserts that the district court substantially impaired his right to effective assistance of counsel by placing time restrictions on his counsel's closing argument. We disagree. The district court is afforded broad discretion in controlling closing arguments and is only to be reversed when there is a clear abuse of its discretion. United States v. Cannon, 88 F.3d 1495, 1502 (8th Cir. 1996). "A reversal may be required where counsel is restricted within unreasonable bounds." United States v. Butler, 317 F.2d 249, 257 (8th Cir. 1963). In the instant case, a reversal is not required.
 
 
 124
 After reviewing the closing argument of White's counsel, it does not appear that the counsel needed more time. Counsel addressed the credibility of the government's witnesses, read portions of the transcripts to the jury, referred to matters not in evidence, argued his client did not have knowledge of the conspiracy, and made other policybased arguments. Moreover, after the district court informed him that he had two minutes remaining, he quickly concluded his remarks. See J.A. at 1945MM. He did not request any additional time at that time. "Counsel may not apparently agree or acquiesce in the allotment of time for argument and afterward complain that the time allowed was too short." Capriola v. United States, 61 F.2d 5, 11 (7th Cir. 1932). Therefore, we find that the district court did not abuse its discretion by imposing the time restrictions on the closing argument.
 
 X.
 
 125
 Appellants next raise numerous issues concerning their sentences. The most important contention is appellant W. Rhynes' argument that his sentence must be vacated because the jury's verdict in this multidrug conspiracy was ambiguous, and the sentence exceeded the statutory maximum for the drug (marijuana) carrying the lowest statutory penalty. At trial, the district court told the jury that it could find a defendant guilty on the conspiracy count if it found that the defendant had conspired to "distribute or possess with intent to distribute heroin, or cocaine, or cocaine base or marijuana." J.A. at 1945OO. The court submitted a general verdict sheet to the jury, and the jury returned a general verdict finding all of defendants guilty of the conspiracy count. Neither the Government nor the defense requested a special verdict as to the object of the conspiracy.
 
 
 126
 Appellants now argue that it is "impossible to determine which controlled substance the jury may have found was the object of the conspiracy." Post Argument Second Supplemental Brief for Appellants at 2. They contend that the jury could have reasonably found that the object of the conspiracy was marijuana, "just as easily as it could have found any of the other controlled substances." Id. at 3. Therefore, they contend that the sentence by the district court should not have exceeded the statutory maximum for marijuana. As the defense did not object to the submission of a general verdict, request a special verdict, nor object to the conversion of drug amounts, we review the imposition of the sentence for plain error. United States v. Olano, 507 U.S. 725, 736 (1993).
 
 
 127
 The United States Supreme Court has recently addressed the sentencing issue in question in Edwards v. United States, 118 S.Ct. 1475 (1998). The defendants in Edwards were charged with conspiracy to distribute both cocaine and cocaine base. Edwards, 118 S. Ct. at 1476. After the close of evidence, the district court instructed the jury that it could find the defendants guilty if it found that they had conspired to distribute either cocaine or cocaine base. The jury returned a general verdict of guilty, without any indication of whether it found the conspiracy to be directed to cocaine, cocaine base, or both. The district court then sentenced the defendants based on its finding that their conduct had involved both cocaine and cocaine base.
 
 
 128
 Before the Supreme Court, the defendants argued that, because the jury's general verdict may have been based on a "cocaine-only" conspiracy, the district court erred in sentencing them under the more stringent guidelines applicable to cocaine base. Although Justice Breyer, writing for the unanimous Court, rejected the defendants' argument, he noted that the outcome would have been different if their sentences had exceeded the statutory maximum for a cocaineonly conspiracy: "That is because a maximum sentence set by statute trumps a higher sentence set forth in the Guidelines." Id. at 1477. But the defendants could not raise such an argument because "the sentences imposed here were within the statutory limits applicable to a cocaine-only conspiracy, given the quantities of that drug attributed to each petitioner." Id. at 1477-78.
 
 
 129
 In support of this line of reasoning, the Court relied on the Second Circuit's decision in United States v. Orozco-Prada, 732 F.2d 1076 (2d Cir. 1984). In that case the defendant had been convicted under a general verdict on a count charging conspiracy to violate 21 U.S.C. § 841 by distributing both cocaine and marijuana. The verdict did not specify whether the conviction had been based on cocaine or marijuana distribution (or a combination of both). The district court then sentenced the defendant to eight years' imprisonment, which exceeded the five-year maximum applicable to marijuana offenses, but which was less than the fifteen-year limit applicable to cocaine distribution. Orozco-Prada, 732 F.2d at 1083. The Second Circuit held that a defendant convicted under a general verdict of conspiracy to violate § 841 may be sentenced only up to the statutory maximum for the least-punished drug offense on which that conspiracy verdict might have been based. Id. at 1083-84. The Second Circuit recently re-affirmed Orozco-Prada in light of the Supreme Court's ruling in Edwards. See United States v. Barnes, 158 F.3d 662, 669 (2d Cir. 1998).
 
 
 130
 Significantly, the Second Circuit premised its decision in OrozcoPrada to a large extent on the 1975 decision of this court in United States v. Quicksey, 525 F.2d 337 (4th Cir. 1975). See Orozco-Prada, 732 F.2d at 1083. In Quicksey, the defendants were charged under a single count of conspiracy, which had two statutory objects: (1) distribution of drugs in violation of 21 U.S.C. § 841 and (2) crossing state lines in connection with a drug business, as prohibited by 18 U.S.C. § 1952 (the "Travel Act"). The jury convicted the defendants under a general verdict, without specifying which object(s) had been the basis of the conviction. The district court then sentenced the defendants to prison terms in excess of the maximum permitted by the conspiracy statute applicable to the Travel Act violation.
 
 
 131
 The Quicksey court invalidated these sentences, reasoning that the sentences improperly exceeded the statutory maximum for the lesser of the two statutory objects of the conspiracy on which the verdict could have been based. Quicksey, 525 F.2d at 340-41. Accordingly, the applicable precedent in the Fourth Circuit-Quicksey--is consistent with the view expressed by the Supreme Court in Edwards, as discussed above.
 
 
 132
 The facts of the current case fall squarely within the ambit of Quicksey and Edwards. Here, the district court properly instructed the jury that it could find a defendant guilty on Count I if the jury determined that such defendant had conspired "to distribute or possess with intent to distribute heroin, or cocaine, or cocaine base, or marijuana." J.A. 194-5OO (emphasis added). The jury then returned a general verdict finding all defendants guilty of Count I. J.A. 1948. The Government did not request a special verdict form, as was its obligation. See Barnes, 158 F.3d at 672 ("[I]t is `the government's responsibility to seek special verdicts.'"). With these general verdicts, it is thus impossible to determine on which statutory object or objects-sale of heroin, cocaine, cocaine base, or marijuana--the conspiracy conviction was based.
 
 
 133
 Accordingly, as they must be applied here, Quicksey and Edwards prohibited the district court from imposing a sentence in excess of the statutory maximum for the least-punished object on which the conspiracy conviction could have been based. In this case, the conviction may have been based on a conspiracy to distribute either heroin, cocaine, cocaine base, or marijuana (or any combination of these substances). Thus, no defendant could be sentenced for more than the statutory maximum for the least-serious, single-drug conspiracy of which he may have been convicted. See United States v. Dale, 178 F.3d 429, (6th Cir. May 27, 1999) (reading Edwards to suggest that "the shorter maximum sentence should be used if the verdict is merely general, rather than specific, and the one drug allows for a sentence above the maximum for another charged drug.").
 
 
 134
 The penalties for all such conspiracies are determined by § 841(b). But this section does not set any concrete, maximum sentence for all violations involving a particular drug; instead, the maximum sentences vary with the type and amount of drug in question. Accordingly, to determine the applicable maximum sentence for any defendant, the district court first had to determine how much of any drug could be attributed to that defendant. See Edwards, 118 S. Ct. at 1477-78 (approving sentences set "within the statutory limits applicable to a cocaine-only conspiracy, given the quantities of that drug attributed to each petitioner"); Barnes, 158 F.3d at 666-67 (applying Orozco-Prada analysis based on amount of drugs attributable to each defendant); Dale, 178 F.3d at 432-33 (statutory maximum sentences depend on drug amounts disclosed by "the facts of this case"). As it must in any drug conspiracy case, the district court made such a determination here.[2]
 
 
 135
 However, the district court did not determine whether the sentences it imposed exceeded the statutory maximum applicable to the leastpunished conspiracy of which each defendant might have been convicted.[3] Three of the sentences did exceed the applicable maximums. The sentences of W. Rhynes, T. Adams, and A. Adams exceed the maximum "marijuana-only" sentence for which each was eligible, i.e., five years for Alexander Adams and ten years for Willie Rhynes and Theodore Adams, given their prior felony drug convictions. See § 841(b)(1)(D). Each of these sentences thus violates the mandate of Quicksey and Edwards.
 
 
 136
 Accordingly, we will follow the remedy employed in Quicksey. We will withhold judgment as to the sentences of W. Rhynes, T. Adams, and A. Adams under Count I, giving the Government the choice between resentencing these defendants consistent with a marijuana conspiracy conviction, or retrying them on Count I. See Quicksey, 525 F.2d at 341. If the Government chooses to resentence these defendants, we will affirm the convictions and remand for resentencing. If the Government does not so choose, we will vacate the sentences and remand for a new trial on Count I.[4]
 
 XI.
 
 137
 The other issues raised by appellants concerning their sentences are without merit. Appellants W. Rhynes and M. Rhynes contend that the district court abused its discretion by not relying upon the jury's $1,000,000 forfeiture verdict in calculating the quantity of illegal drugs foreseeable to them for sentencing purposes. Although they recognize that a sentencing judge is not bound by a jury's verdict in performing the independent sentencing function, see United States v. Love, 134 F.3d 595 (4th Cir. 1998), cert. denied by Sheppard v. United States, 118 S.Ct. 2332 (1998), they argue that the judge in this case was in the same position as an appellate court would be because he did not preside over the trial. They argue that since the judge was relying on the transcripts and other court documents in making his determination, he should have deferred to the jury, who actually had the opportunity to assess the credibility of the witnesses who were presented at trial. They do not cite any case law that supports this position.
 
 
 138
 We do not agree with Appellants' argument. As has been discussed, under the Sentencing Guidelines, the district court "has a separate obligation . . . to make independent factual findings regarding relevant conduct for sentencing purposes." Id. at 605; see U.S.S.G. § 1B1.3. It is clear that in this case, the district judge considered all of the information available to him in making his sentencing determination. See J.A. at 2687 ("I've been assiduously reading the record and attempting to be as much up on the case as any judge in my situation could be."). The Supreme Court has held that district judges should have "`the fullest information possible concerning the defendant's life and characteristics'" when making this determination. United States v. Watts, 519 U.S. 148, 152 (1997) (per curiam) (quoting Williams v. New York, 337 U.S. 241, 247 (1949)). Further, 18 U.S.C. § 3661 provides:
 
 
 139
 No limitation shall be placed in the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.
 
 
 140
 As this circuit held in Love that the "attempt to impose . . . forfeiture verdicts as artificial limitations on the district's judge sentencing discretion turns 18 U.S.C. § 3661 on its head." 134 F.3d at 605. Therefore, we find that the district court did not err because it failed to rely on the jury's forfeiture verdict.
 
 XII.
 
 141
 Appellant M. Rhynes next argues that the district court erred by adding one point to his Criminal History category based upon his May 24, 1991, conviction of carrying a concealed weapon and also increasing his offense level by two points due to his possession of a firearm as part of his drug trafficking activities. He argues that the only evidence at trial of his connection with any firearm was the 1991 conviction. He states that "[t]o also enhance his offense level by 2, constitutes double-counting and should be prohibited by the rule against double counting." Brief for Appellant at 57. See United States v. Stokley, 881 F.2d 114, 117 (4th Cir. 1989).
 
 
 142
 We find that the sentencing was proper in this regard. The sentencing brief submitted by the Government summarized the evidence concerning M. Rhynes' possession of a firearm during the course of the conspiracy, including statements by two witnesses to that effect. Further, the presentence reports also detailed the evidence relating to the possession of weapons by M. Rhynes' co-defendants and coconspirators. Under the Sentencing Guidelines, a two level enhancement for possession of a dangerous weapon as part of a drug crime can be assessed if the possession of a firearm by a co-conspirator was reasonably foreseeable to a defendant. See U.S.S.G. § 2D1.1(b); United States v. Kimberlin, 18 F.3d 1156, 1160 (4th Cir. 1994) (citing United States v. White, 875 F.2d 427, 433 (4th Cir. 1989)) ("[C]ourts have attributed weapons carried by co-conspirators to a defendant when `under the circumstances of the case, it was fair to say that it was reasonably foreseeable to [defendant] that his co-participant was in possession of a firearm.'"). Given the nature of the conspiracy in this case, we find that the possession of weapons by his co-defendants and co-conspirators was reasonably foreseeable to M. Rhynes. Therefore, the district court did not err in assessing both a criminal history point and increasing M. Rhynes' offense level two points.
 
 XIII.
 
 143
 Appellants also argue that the district court erred in applying management enhancements to each defendant pursuant to U.S.S.G. § 3B1.1. To qualify for such an enhancement,"the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." Id. comment n.2. This circuit has detailed the certain factors which are to be considered in determining whether U.S.S.G. § 3B1.1. applies. See United States v. Chambers, 985 F.2d 1263, 1268 (4th Cir. 1993). These factors include:
 
 
 144
 the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
 
 
 145
 Id. (citing U.S.S.G. § 3B1.1, comment. n.3).
 
 
 146
 Appellants argue that the district court did not make factual findings which were specific enough to demonstrate that it applied these factors. Therefore, they argue that meaningful appellate review is precluded, and we should vacate the sentence and remand. We normally review the district court's application of a role enhancement for clear error. See United States v. Kincaid, 964 F.2d 325, 329 (4th Cir. 1992). However, as appellants did not raise any objection to the district court's lack of factual findings at the sentencing hearing, we shall review for plain error. See United States v. Davis, 954 F.2d 182, 18687 (4th Cir. 1992).
 
 
 147
 The district court, with a few exceptions, primarily adopted the presentence reports' recommended findings. We find that there was sufficient evidence in the record, the presentencing reports, and the testimony presented at the sentencing hearing to support the district court's findings that managerial enhancements were applicable to appellants. Therefore, any error by the district court in terms of the specifics of its factual findings is harmless.
 
 XIV.
 
 148
 Appellants Gormley and McCoy assert that the district court erred by relying on unreliable hearsay in determining the drug quantities attributable to them. It is well settled that courts may use reliable hearsay in making their independent resolutions of this factual issue at sentencing. See United States v. Terry, 916 F.2d 157, 160 (4th Cir. 1990). It is also well settled that a court may rely upon uncorroborated hearsay testimony if the testimony is otherwise reliable. United States v. Bowan, 926 F.2d 380 (4th Cir. 1991). The district court's evaluation of reliability is reviewed under an abuse of discretion standard. United States v. Petty, 982 F.2d 1365, 1369 (9th Cir. 1993).
 
 
 149
 Appellants contend that statements from witnesses who provided information which was used to determine drug amounts by the federal case agent, but who did not testify at trial were unreliable. When viewed in light of the corroborating evidence, these statements were sufficiently reliable. As long as the factual evidence relied upon has some minimal indicia of reliability beyond mere allegations, due process is satisfied. United States v. Hicks, 948 F.2d 877, 883 (4th Cir. 1991). We find that the district court did not abuse its discretion in relying upon these statements.
 
 
 150
 Further, the district court's determination of drug quantity is reviewed for clear error. United States v. Williams, 880 F.2d 804, 806 (4th Cir. 1989). Based on the district court's use of reliable hearsay, and the considerable support for the findings in the record, we cannot find the court's determination of drug quantities attributable to McCoy and Gormley to be clearly erroneous. Therefore, we affirm.
 
 XV.
 
 151
 Finally, Appellants argue that the district court's jury instruction as to Count One, the drug conspiracy "constructively amended the indictment." Brief for Appellants at 70. As Appellants did not object to the jury instruction at trial, we review for plain error. United States v. Floresca, 38 F.3d 706, 714 (4th Cir. 1994) (en banc). "[T]o reverse for plain error the appellate court must (1) identify an error, (2) which is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Brewer, 1 F.3d 1430, 1434-35 (4th Cir. 1993) (citations omitted).
 
 
 152
 Appellants contend that as the indictment was worded conjunctively, the Government was required to prove beyond a reasonable doubt that defendants conspired to possess and distribute heroin, cocaine, cocaine base, and marijuana. They concede that the statutes that they were charged with violating "would permit their conviction upon a showing beyond a reasonable doubt that they conspired to traffic in any" of the substances. Brief for Appellants at 71. Where a statute is worded in the disjunctive, federal pleading requires the Government to charge in the conjunctive. The district court, however, can instruct the jury in the disjunctive. See Turner v. United States, 396 U.S. 398, 420 (1970); United States v. Champion, 387 F.2d 561 (4th Cir. 1967). Therefore, the district court's jury instruction in the disjunctive did not constructively amend the indictment.
 
 
 153
 Additionally, a review of the record shows that the district court properly defined the specific elements of the charged crime for the jury, and reminded the jury that the Government had the burden to prove those elements beyond a reasonable doubt. J.A. at 1945NN, 1945SS-1945UU. There was no plain error, and we affirm.
 
 XVI.
 
 154
 For the reasons stated, we affirm appellants' convictions and sentences, except that we withhold judgment on the convictions of W. Rhynes, A. Adams, and T. Adams on Count I.
 
 AFFIRMED IN PART, JUDGMENT WITHHELD IN PART
 
 155
 In Nos. 97-4466(L), rehearing en banc on the witness exclusion issue of Michael Rhynes is granted. Parts IV and XVI (only insofar as Part XVI relates to Part IV) of the published majority opinion filed 10/26/99 are vacated, with the balance of the majority opinion to remain in full force and effect.
 
 
 
 Notes:
 
 
 [1]
 "Any conviction . . . for which a person has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such . . . restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." Id.
 
 
 [2]
 The Pre-sentence Investigation Reports for the defendants, which the district court adopted, attributed drugs of the following amounts and types to each defendant: (a) Willie Rhynes: 3.63 kg. of marijuana, 70.5 kg. of cocaine, 6060.49 grams of heroin, and 9.29 kg. of cocaine base; (b) Michael Rhynes: 125.61 kg. of cocaine, 528.35 grams of heroin, and 13.9 kg. of cocaine base; (c) Theodore Adams: .01 kg. of marijuana, 1056.7 grams of cocaine, 107.9 grams of heroin, and 24 oz. of cocaine base; (d) Purvis Gormley: 212.62 grams of cocaine, 56.7 grams of heroin, and 141.75 kg. of cocaine base; (e) John White: 1.24 kg. of heroin; (f) Lester McCoy: .5 kg. of cocaine, 8 grams of heroin, and 500 grams of cocaine base; and (g) Alexander Adams: 1.25 kg. of marijuana, 18.77 kg. of cocaine, 2.01 kg. of heroin, and 10.32 kg. of cocaine base.
 
 
 [3]
 The following are the maximums for the least-serious, single-drug conspiracy for which the individual defendants would have been eligible: (a) Willie Rhynes: 10 years under § 841(b)(1)(D), based on 3.63 kg. of marijuana and a prior felony drug conviction; (b) Michael Rhynes: 40 years under § 841(b)(1)(B), based on 528.35 grams of heroin; (c) Theodore Adams: 10 years under § 841(b)(1)(D), based on .01 kg. of marijuana and a prior felony drug conviction; (d) Purvis Gormley: 30 years under § 841(b)(1)(C), based on 56.7 grams of heroin and a prior felony drug conviction; (e) John White: life, as all attributable drug amounts fall under § 841(b)(1)(A); (f) Lester McCoy: 30 years under § 841(b)(1)(C), based on 8 grams of heroin and a prior felony drug conviction; and (g) Alexander Adams: 5 years under § 841(b)(1)(D), based on 1.25 kg. of marijuana.
 The following sentences were actually imposed on Count I: (a) Willie Rhynes: life; (b) Michael Rhynes: 360 months; (c) Theodore Adams: life; (d) Purvis Gormley: 292 months; (e) John White: 292 months; (f) Lester McCoy: 262 months; and (g) Alexander Adams: 360 months.
 
 
 [4]
 A. Adams and T. Adams have argued that the district court failed to make detailed findings which resolved issue placed in dispute when it made its determination about the drug quantities attributable to them. T. Adams has also argued that the district court erred by using an aggregate drug amount when applying the mandatory life sentence enhancement to him. In light of the analysis in this section, we need not address these two issues. We note, however, that both of these issues were based on the appellants' position that the district court failed to make adequate findings. It is clear from the record that the district court adopted the findings of the pre-sentence report as its own. "The required finding of the district court may be made by the court's separate recitation of its finding as to each controverted matter or the court's express adoption of the recommended findings contained in the pre-sentence report." United States v. McManus, 23 F.3d 878, 887 (4th Cir. 1994). Therefore, these issues were without merit.
 
 
 
 156
 KING, Circuit Judge, concurring in part and dissenting in part:
 
 
 157
 Because I believe the exclusion of appellant Michael Rhynes's only supporting witness was prejudicially erroneous, I respectfully dissent from Part IV of the majority decision, which upholds the ultimate penalty of witness exclusion. I otherwise concur in the majority opinion.
 
 I.
 
 158
 The district court's decision to exclude the witness Corwin Alexander runs head-on into Michael Rhynes's Sixth Amendment right to call witnesses in his behalf.[1] This right is a cornerstone of our system of justice: "Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself." Taylor v. Illinois, 484 U.S. 400, 408 (1988).
 
 
 159
 Accordingly, we have recognized that excluding a defense witness is the severest possible penalty for violation of a sequestration order and that, as such, it should be imposed to remedy only egregious violations: "Because exclusion of a defense witness impinges upon the right to present a defense, we are quite hesitant to endorse the use of such an extreme remedy." United States v. Cropp, 127 F.3d 354, 363 (4th Cir. 1997). Here, I cannot agree that the district court rightly imposed the ultimate penalty of excluding Corwin Alexander from the witness stand, where that exclusion was based on a defense attorney's alleged violation of an "interpretation" of a sequestration order.
 
 II.
 
 160
 The district court excluded Corwin Alexander because Michael Rhynes's court-appointed attorney, Mr. Scofield, in preparation for defending his client, spoke with Alexander about a prior witness's testimony. The district court concluded that Mr. Scofield's conversation with Alexander regarding prior trial testimony had violated the court's sequestration order. I am unable to find any such violation and conclude that there was none. As a result, the district court's decision to exclude Alexander on the basis of a non-existent violation was an error of law and, by definition, an abuse of discretion. See Koon v. United States, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.").
 
 A.
 
 161
 Nothing in the district court's sequestration order--which it described as "the usual sequestration rule . . . that the witnesses shall not discuss one with the other their testimony"--prohibits attorneys from discussing anything with anyone.[2] Further, no such prohibition appears on the face of Federal Rule of Evidence 615,[3] or in any other evidence rule or rule of court, or--until today--in any decision of this court. Put simply, Mr. Scofield's actions violated no court order or court rule, and were, indeed, consistent with the highest and best traditions of lawyering. See Part II.B, infra.
 
 
 162
 The majority does not contend that the text of Rule 615 prohibited Mr. Scofield's conversations with Corwin Alexander. And, although it curiously argues that the district court's oral sequestration order "was drawn to ensure that there was no witness coaching," ante at 26 (emphasis added), the majority points to nothing in the wording of the district court's order that even implicitly barred Mr. Scofield, or any attorney in the case, from speaking with any witness. Nevertheless, the majority seeks to compensate for this lack of record support by arguing that the district court was free to "interpret" its sequestration order in a manner that converted Mr. Scofield's conversation with Corwin Alexander, after the fact, into a violation of the order.[4]
 
 
 163
 I wholeheartedly disagree with this ruling by the majority. The majority cites no authority for the proposition that an unadorned sequestration order, although devoid of any reference to lawyers, nevertheless may be interpreted to prohibit lawyers from discussing trial proceedings with prospective witnesses.[5] I likewise can find no notable authority to support this novel position.
 
 
 164
 Indeed, relevant authorities interpret Rule 615 otherwise. Court decisions and the leading commentators agree that sequestration orders ordinarily do and should permit witnesses to discuss the case with counsel for either party: "Sequestration requires that witnesses not discuss the case among themselves or anyone else, other than the counsel for the parties." United States v. Walker, 613 F.2d 1349, 1354 (5th Cir. 1980) (emphasis added) (citing Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966)); accord United States v. Buchanan, 787 F.2d 477, 485 (10th Cir. 1986) ("The witnesses should be clearly directed, when [Rule 615] is invoked . . . that they are not to discuss the case . . . with anyone other than counsel for either side.") (emphasis added);[6] 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 615.06 (Joseph M. McLaughlin, ed., 2d ed. 1998) ("[Sequestration] instructions, however, usually permit the witnesses to discuss their own or other witnesses' testimony with counsel for either side.") (emphasis added); 2 Charles A. Wright, Federal Practice & Procedure § 415 (2d ed. 1982) ("If exclusion is ordered, the witnesses should be instructed not to discuss the case with anyone except counsel for either side.") (emphasis added).[7]
 
 
 165
 Undeterred by the weight of contrary authority, the majority upholds the district court's ruling that its order actually prohibited attorney-witness discussions of testimony as a permissible "interpretation" of the sequestration order. See ante at 369-370. While acknowledging that such interpretations are reversible if they are "clearly . . . an abuse of discretion," Texas N.W. Ry. Co. v. Diamond Shamrock Ref. & Mktg. Co., 865 F.2d 807, 810 (7th Cir. 1988), the majority concludes that the district court's "interpretation" of the order was "reasonable." See ante at 228-29.
 
 
 166
 I cannot agree. If a district court does not exceed its discretion by interpreting a sequestration order in a manner that is (1) unsupported by its text; (2) unsupported by Rule 615; (3) unprecedented in this circuit; (4) contrary to the overwhelming weight of persuasive case law and scholarship; and (5) arguably unconstitutional, see Part II.B, infra, then the district court's discretion to interpret its orders is effectively limitless. As a practical matter, the majority's position would permit district judges, when faced with any trial activity they dislike, not only to order it stopped prospectively, but to punish it as if it were a violation of a then-existing order. Such post-hoc exercises of regulatory power are wholly inconsistent with our system of justice. See generally Kaiser Aluminum & Chem. Corp. v. Bonjorno , 494 U.S. 827, 855 (1990) (Scalia, J., concurring) ("[The] principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.").
 
 
 167
 The majority's final defense of its ruling underscores a logical fallacy underlying its position. The majority states that Mr. Scofield did not violate the sequestration order by speaking with Alexander, but only by informing him of prior testimony. Based on this understanding of the order, the majority concludes that "counsel had ample room to interview and prepare witnesses without running afoul of the [sequestration] order." See ante at 229.
 
 
 168
 But this conclusion begs the question, "How was counsel to discern the limits of the sequestration order?" Those limits--as declared after the fact by the district court--did not appear on the face of the order, in Rule 615, in controlling precedent, or even in persuasive authorities. In fact, the majority makes it virtually impossible for counsel to know whether they have "ample room" to perform essential tasks without violating an order, because the majority today effectively grants district courts limitless discretion to expand their orders through post-hoc "interpretation."[8]
 
 B.
 1.
 
 169
 Not only were Mr. Scofield's actions consistent with the order the district court actually issued and the text of Rule 615, they were consistent with well-established policies underlying the rule. We have recognized that Rule 615 is "designed to discourage and expose fabrication, inaccuracy, and collusion." Opus 3 Ltd. v. Heritage Park, Inc., 91 F.3d 625, 628 (4th Cir. 1996). Put differently, Rule 615 helps to smoke out lying witnesses: "It is now well recognized that sequestering witnesses `is (next to cross-examination) one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice.'" Id. (citing 6 Wigmore on Evidence § 1838, at 463).[9]
 
 
 170
 While courts may in their discretion decide to go beyond the provisions of Rule 615 and bar witness-to-witness conversations about prior testimony, with the view that such an order is appropriate to enhance the truth-seeking process, preventing
 
 
 171
 lawyers from lawyering is simply inappropriate. The majority nevertheless concludes that a lawyer-to-witness discussion of prior testimony"poses the exact same risk as allowing witnesses to speak with one another." See ante at 228.
 
 
 172
 This proposition is simply unfounded and inaccurate. Lawyers are not like witnesses, and the majority ignores critical differences between them that are dispositive in this case. Unlike witnesses, lawyers are officers of the court, and as such, they owe the court a duty of candor. Model Rules of Professional Conduct Rule 3.3 (1995). Of paramount importance here, that duty both forbids an attorney from knowingly presenting perjured testimony and permits the attorney to refuse to offer evidence he or she reasonably believes is false. Id. Rule 3.3(a)(4), (c). Similarly, an attorney may not "counsel or assist a witness to testify falsely." Id. Rule 3.4(b). And if an attorney believes that a non-client witness is lying on the witness stand about a material issue, he is obliged to "promptly reveal the fraud to the court." Id. Rule 3.3, cmt. 4. The Supreme Court has emphasized the importance of attorneys' duty of candor: "Any violation of these strictures would constitute a most serious breach of the attorney's duty to the court, to be treated accordingly." Geders v. United States, 425 U.S. 80, 90 n.3 (1976) (citing to parallel provisions of Model Code of Professional Responsibility).
 
 
 173
 Consequently, lawyers' ethical obligations to the court distinguish them from trial witnesses, whose discussions with other prospective witnesses may properly be forbidden by sequestration orders. Further, if an attorney has inappropriately "coached" a witness, thorough cross-examination of that witness violates no privilege and is entirely appropriate and sufficient to address the issue. In Geders, Chief Justice Burger, for a unanimous Court, endorsed cross-examination as the swift antidote for witness coaching:
 
 
 174
 The opposing counsel in the adversary system is not without weapons to cope with "coached" witnesses. A prosecutor may cross-examine a defendant as to the extent of any "coaching" . . . . Skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility, if it developed that defense counsel had in fact coached the witness as to how to respond . . . .
 
 
 175
 Geders, 425 U.S. at 89-90.
 
 
 176
 Nevertheless, the majority concludes that Mr. Scofield's discussion with Corwin Alexander warranted excluding Alexander as a witness: "Conduct such as witness coaching and perjury threatens to destroy the integrity of this process. The risk of this type of conduct inhered in the circumstances of this case." See ante at 227. In other words, the majority implies that by discussing prior trial testimony with Corwin Alexander, Mr. Scofield necessarily coached Alexander or made it likely that Alexander would commit perjury.[10] To the contrary, I intrinsically trust in lawyers' abilities to discharge their ethical obligations, including their duty of candor to the court, without being policed by overbroad sequestration orders. Furthermore, I trust that, if an attorney is lax in his duty of candor, that laxness can be exposed --even exploited--by skillful cross-examination.
 
 2.
 
 177
 But subjecting lawyers to overbroad sequestration orders is not simply a benign redundancy. Instead, such orders affirmatively harm the adversarial process by hindering attorneys from discharging their duties to the client. To a client, an attorney owes competence. Model Rules Rule 1.1. To fulfill this basic duty, the attorney must prepare carefully for the task at hand: "Competent representation requires . . . thoroughness and preparation reasonably necessary for the representation." Id. Rule 1.1(a).
 
 
 178
 In the context of a complex and protracted trial, like the one that took place here, thorough preparation demands that an attorney interview and prepare witnesses before they testify. Indeed, what lawyer would call a witness without appropriate and thorough pre-trial interviews and discussion? The answer is obvious--none who takes seriously the ethical obligation of providing competent representation. Notably, more than one lawyer has been punished, found ineffective, or even disbarred for incompetent representation that included failure to prepare or interview witnesses. United States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (defense counsel ineffective for failing to interview witnesses); McQueen v. Swenson, 498 F.2d 207 (8th Cir. 1974) (same); In re Warmington, 568 N.W.2d 641, 668 (Wis. 1997) (lawyer disbarred for, among other things, "failing to supervise the preparation of an expert witness"); In re Wolfram , 847 P.2d 94, 96 (Ariz. 1993) (failure to interview witnesses cited among reasons for suspending attorney).
 
 
 179
 By stretching Rule 615 to implicitly prohibit attorneys from speaking to witnesses regarding prior trial testimony, the majority hamstrings attorneys in performing their obligations to competently defend their clients. Our adversarial system works best when lawyers are permitted and encouraged to engage in effective lawyering. This is precisely the sentiment Mr. Scofield expressed to the district court when the court told him that he had violated the sequestration order: "I'm sorry then, Your Honor. I've done wrong then because I don't know how else I can prepare [Alexander] to testify."[11] J.A. 1945M.
 
 
 180
 And in the context of a criminal trial, like this one, a defense attorney's duty to her client assumes constitutional stature: "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. We have rightly recognized that even the "powerful policies behind sequestration" must bend to the dictates of the Constitution. Opus 3 Ltd., 91 F.3d at 628.[12] So it must be here.
 
 
 181
 In my view, sequestration orders that prevent attorneys from performing their duties as counsel, including discussing trial proceedings with future witnesses, may well violate a criminal defendant's Sixth Amendment rights. The Supreme Court has explicitly forbidden some sequestration orders that prohibit a defendant-witness from conferring with counsel. Geders, 425 U.S. at 87; accord United States v. Allen, 542 F.2d 630, 633 (4th Cir. 1976). And at least one court has extended this reasoning to sequestration orders preventing counsel from discussing prior testimony with non-defendant witnesses:
 
 
 182
 It has been held that to deprive a party . . . of the right to consult with counsel as the trial proceeds is to infringe its right to due process of law. This court believes that similar considerations apply to the right of a party to have his counsel free to discuss with prospective witnesses developments in the case, including the testimony of other witnesses.
 
 
 183
 United States v. Scharstein, 531 F. Supp. 460, 463-64 (E.D. Ky. 1982) (emphasis added).
 
 
 184
 Given the constitutional significance of the duties Mr. Scofield was seeking to carry out, I cannot agree that the district court was within its discretion to hinder his performance of those duties with an expansive, unprecedented, and after-the-fact "interpretation" of its sequestration order. I certainly cannot agree that, because his attorney took actions that neither the Supreme Court, this court, nor any district court in this circuit has ever expressly forbidden, Michael Rhynes should have been penalized with the exclusion of his sole supporting witness. To the contrary, where an attorney seeks to perform his constitutionally-mandated duty to effectively represent a criminal defendant, he must be free to interview defense witnesses and to discuss with them all appropriate matters, without being muzzled by an overbroad sequestration order.[13]
 
 III.
 
 185
 While I agree with the majority that harmless error analysis applies to the district court's erroneous exclusion of Corwin Alexander, I am satisfied that the erroneous exclusion of Michael Rhynes's sole corroborating witness, who would have sought to rebut much of the Government's evidence against Michael Rhynes, cannot have been harmless. This is an error of constitutional magnitude--a deprivation of Michael Rhynes's Sixth Amendment right to call witnesses on his behalf. For this constitutional error to be harmless, the Government must establish, to the satisfaction of this Court beyond a reasonable doubt, "that a rational jury would have found the defendant guilty absent the error." United States v. Neder, 119 S. Ct. 1827, 1838 (1999).
 
 
 186
 In its effort to surmount this hurdle, the majority claims harmless error because the "amount" of evidence against Rhynes was, in its view, "voluminous" or "massive."[14]. See ante at 373-374. Even if this assessment is accepted as true, that would not be sufficient. Alexander's proposed testimony, summarized below, would have controverted most of the Government's evidence against Rhynes. And importantly, "overwhelming" but genuinely "contested" evidence does not satisfy the "reasonable doubt" harmless error standard. See Neder, supra, 119 S. Ct. at 1837-39.
 
 
 187
 As the appellants have pointed out, Alexander would have sought to corroborate several details of Michael Rhynes's own testimony, to discredit several of the Government's witnesses, and to counter a number of the inferences the Government sought to draw from its evidence. See ante at 367 (summarizing evidence proposed to be presented by Alexander). Specifically, Alexander would have testified about his close relationship with Michael Rhynes and would have said that Alexander had never dealt drugs with Michael Rhynes or with anyone else. Further, he would have testified that he knew at least seven of the Government's witnesses well, and that each of them had a reputation for untruthfulness. Alexander would have corroborated Michael Rhynes's testimony that he received a particular sum of money from an insurance settlement and not, as the Government had contended, from illegal sources. Finally, Alexander would have testified that he accompanied Michael Rhynes on a trip to New York, which the Government claimed had been a drug-related trip. Alexander would have explained that he and Michael Rhynes had gone to see a basketball game and that they had had no involvement with drugs, on this trip or otherwise.[15]
 
 
 188
 When he lost Alexander as a witness, Michael Rhynes lost the opportunity to independently challenge the Government on all of these issues. Michael Rhynes was, by this ruling, clearly denied his constitutionally-protected right to fairly defend himself, and he is now serving a prison sentence of thirty years. I simply cannot conclude that a criminal defendant's loss of his sole supporting witness could, under these circumstances, be harmless.
 
 IV.
 
 189
 Respectfully, I would vacate Michael Rhynes's conviction and remand his case to the district court for a new trial.
 
 
 
 Notes:
 
 
 [1]
 "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend. VI.
 
 
 [2]
 The entirety of the sequestration order, granted orally from the bench at the outset of trial, is in the record as follows:
 Well, I do grant the usual sequestration rule and that is that the witnesses shall not discuss one with the other their testimony and particularly that would apply to those witnesses who have completed testimony not to discuss testimony with prospective witnesses, and I direct the Marshal's Service, as much as can be done, to keep those witnesses separate from the--those witnesses who have testified separate and apart from the witnesses who have not yet given testimony who might be in the custody of the marshal.
 J.A. 273-74. Further, there is no gloss on Rule 615 of the Federal Rules of Evidence, see infra note 3, in any local rules of court--either those of the Southern District of West Virginia, where the presiding district judge ordinarily sits, or those of the Western District of North Carolina, where the case was tried--that might further explain what the district court meant by the "usual" rule.
 
 
 [3]
 By its terms, Rule 615 merely provides for the exclusion of certain witnesses from the courtroom:
 At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present. Fed. R. Evid. 615.
 
 
 [4]
 The majority's decision incorrectly implies that we should defer to a district court's interpretation of the law. See ante at 228. Here, if the district court's order was an invocation of Rule 615--the most reasonable construction of that order--then the district court effectively determined that Mr. Scofield violated Rule 615, nothing else. The question of whether Rule 615 prohibits any communication between an attorney and a witness is a question of law, which this court must review de novo. Excluding a defense witness for violations of a sequestration order also has clear Sixth Amendment implications, Cropp , supra, 127 F.3d at 363, and this Court reviews ultimate constitutional questions de novo. See United States v. Meglar, 139 F.3d 1005, 1008 (4th Cir. 1998) ("We review de novo the ultimate question of whether the government violated a defendant's Fifth and Sixth Amendment rights"). In either event, we do not owe unquestioning deference to the district court's finding that Mr. Scofield violated a sequestration order or its decision to exclude Rhynes's witness. See ante at 228-29.
 
 
 [5]
 Given the lack of legal support for the district court's broad interpretation of its order, it is obvious that Mr. Scofield did not intend to violate the sequestration order. When questioned about his discussions with the witness Alexander in preparation of the defense, he was clear about his actions: "I specifically told [Alexander] about that testimony and told him I was going to ask him about that, Your Honor. And I don't think that violates the sequestration order." J.A. 1945M.
 Nor is it insignificant that Mr. Scofield did not understand "the usual sequestration rule" to bar counsel from discussing prior trial occurrences with an upcoming witness. Mr. Scofield is a veteran trial lawyer with more than thirty years of experience, which has included service as an Assistant United States Attorney, state public defender, and law school instructor, as well as private practice. He has been accorded an "AV" rating in the Martindale-Hubbell Law Directory. 13 Martindale-Hubbell Law Directory, at NC36P (1998). This rating, which is awarded to only approximately 20% of the private practice bar, indicates that he is regarded by his peers as possessing the highest legal ability and adhering to the highest ethical standards. If the "usual sequestration rule" implies some limitation on Mr. Scofield's communications with witnesses, then an attorney with his background and experience would certainly have been aware of it.
 
 
 [6]
 In a passage that is internally inconsistent, the Tenth Circuit appears both to endorse and forbid witnesses subject to sequestration from discussing the case with counsel:
 The witnesses should be clearly directed, when [Rule 615] is invoked, that they must all leave the courtroom . . . and that they are not to discuss the case or what their testimony has been or would be or what occurs in the courtroom with anyone other than counsel for either side. See 3 Weinstein's Evidence 615-13. Counsel know, and are responsible to the court, not to cause any indirect violation of the Rule by themselves discussing what has occurred in the courtroom with the witnesses.
 Buchanan, 787 F.2d at 475 (emphasis added). Notably, while the Tenth Circuit cites the respected treatise of Judge Weinstein in support of the first part of this passage, it cites no authority for the second part. The reason is obvious. If witnesses are allowed to discuss "what occurs in the courtroom . . . with counsel"--as the court specifically permits--it is logically impossible for lawyers to take part in the same conversations without themselves violating the court's admonition against counsel "discussing what has occurred in the courtroom with the witnesses." Because this second sentence is nonsensical when read together with the wellsupported rule in the first sentence, its suggestion that lawyer-witness discussions be limited is entirely unpersuasive.
 
 
 [7]
 The majority has located a single commentator that would endorse district court orders explicitly prohibiting witness contacts with attorneys: "While Rule 615 provides solely for the exclusion of witnesses from the courtroom, the court may take further measures . . . such as ordering [witnesses] . . . not to discuss the case with one another or with any attorney . . . ." Michael Graham, Federal Practice & Procedure, Federal Rules of Evidence § 6611, at 216 (interim ed. 1992). Notably, this statement is not supported by the single case that the treatise cites, Perry v. Leeke, 488 U.S. 272 (1989). In Perry, the Court held only that witnesses may be prohibited from speaking with lawyers between direct and cross examination; it did not approve the practice the treatise endorses, namely, generally prohibiting lawyer-witness contact as part of a sequestration order.
 Moreover, even if the treatise were correct on the law, it is irrelevant in this case. The rule it posits--that trial courts may explicitly direct witnesses not to speak with attorneys--does not support the majority's novel approach. The majority would conclude that, even where a trial judge has not "taken further measures" and instructed witnesses to avoid discussing the case with attorneys, it has implicitly forbidden such conduct simply by instructing witnesses not to speak to each other. Not even the lone treatise that the majority cites has taken such an extreme position.
 Nor do the cases the majority cites provide any more support. The majority points to cases holding that sequestration orders, though silent on the matter, may prohibit witnesses from discussing the case with each other out of court or from reading trial transcripts. See ante at 229 (citing United States v. Greschner, 802 F.2d 373 (10th Cir. 1986), Miller v. Universal City Studios, Inc., 650 F.2d 1365 (5th Cir. 1981)). But conspicuously absent from these cases is any decision that would implicitly expand garden-variety sequestration orders to prohibit the only activity relevant in this case: attorney-witness discussions of testimony.
 
 
 [8]
 The majority also asserts that Mr. Scofield could have asked the district court whether the "usual sequestration rule" prohibited any communication between himself and Alexander. See ante at 230. However, any reasonable attorney would have believed that the district court's invocation of the "usual sequestration rule" was a reference to Rule 615, since there was no other controlling rule or standing order. Nothing in Rule 615 or related authority could have raised any doubt for Mr. Scofield about "the propriety of his intended conduct." See ante at 230.
 In my view, the majority's assertion also reveals a misunderstanding of what lawyers must do to prepare for trial and fulfill their obligations to their clients. Mr. Scofield knew that he had an obligation to prepare for Alexander's testimony and that his preparation included ascertaining whether Davis's testimony, especially that part relating to Alexander, was true. The majority apparently would have no problem if (hypothetically) Mr. Scofield had asked Alexander during trial preparation: "You sold drugs to Davis in August 1997, isn't that true?" Yet, if Mr. Scofield asked: "Davis testified that you sold drugs to Davis in August 1997. Is that testimony true?" then the majority would hold that Mr. Scofield violated the "usual sequestration rule" because his question included the words: "Davis testified." We are simply--and unnecessarily--splitting hairs when, under these circumstances, we condemn Mr. Scofield and punish his client with the ultimate penalty of witness exclusion.
 
 
 [9]
 The majority founds its holding on the necessity "to protect the truthfulness of testimony." See ante at 227. However, the search for truth was not furthered by excluding Alexander's testimony. I agree, for example, that if Alexander had been permitted to testify and his testimony had contradicted Davis's testimony, then one--either Alexander or Davis-was not, in all likelihood, testifying truthfully. However, I trust the adversary system to separate the liars from the truthful. The search for truth would have been better served by permitting the jury to determine who was telling the truth. By contrast, the district court's exclusion of Alexander's testimony left Davis's testimony uncontradicted and could have led the jury to believe, and rely upon, untruthful testimony. Put simply, excluding Corwin Alexander as a witness did nothing to further the search for truth.
 
 
 [10]
 For the sake of clarification, I note that nothing in the record even remotely suggests that Mr. Scofield improperly coached Alexander or encouraged him to commit perjury.
 
 
 [11]
 The majority also says that "Scofield not only apologized to the court, but he also commendably related in detail what he could have and should have done instead." See ante at 229. However, the colloquies quoted by the majority demonstrate nothing more than an attorney trying desperately to obtain reconsideration of an erroneous ruling in order to get his only supporting witness to the stand. If anything, Mr. Scofield assumed responsibility so that he, not his client, would be punished. This after-the-fact mea culpa does nothing to allay my concern that the majority's holding unreasonably burdens the ability of lawyers to properly represent their clients and prepare for trial.
 
 
 [12]
 It is important to note that Rule 615, on its face, does not require exclusion of all witnesses from the courtroom. While an absolute rule would no doubt promote the truth-seeking policy behind Rule 615, constitutional considerations have required that exceptions be built into the Rule itself. Opus 3 Ltd., 91 F.3d at 628 ("confrontation and due process considerations" drive Rule 615's exceptions). Parties or their representatives, as well as expert witnesses, are authorized by Rule 615 to remain in the courtroom, hear testimony, and subsequently testify. Rule 615(1)(3). In criminal cases these exceptions in practice are applied to allow the prosecution's case agent--the FBI, DEA, IRS, or BATF agent--to remain at counsel table with the prosecutor, hear the other witnesses testify, and nevertheless testify on behalf of the prosecution.
 And in this very case, the Government's case agent and summary witness were specifically exempted from the sequestration order. J.A. 274. Accordingly, the text of Rule 615 further emphasizes the erroneous nature of the ruling challenged here, and underscores the inappropriateness of the district court's comment that Mr. Scofield's representation of his court-appointed client was "unprofessional."
 
 
 [13]
 If a district court, in its discretion, determines to grant a sequestration order that exceeds the express bounds of Rule 615, the order should at least comport with the following: (1) it should be explicit; (2) it should be of record and timely; (3) it should be entered only after appropriate input from counsel; and (4) it should be tailored as narrowly as possible to achieve its purposes without hindering counsel in performance of their duties to clients and the court. Such criteria seem especially prudent in light of the "confusion about how far the scope of a bald Rule 615 order extends for the sanction of excluding testimony." United States v. McMahon, 104 F.3d 638, 648 (4th Cir. 1997) (Michael, J., dissenting).
 
 
 [14]
 The majority supports its opinion by relying on the "voluminous testimony against M. Rhynes." See ante at 232. However, there is nothing in the Sixth Amendment guaranteeing a criminal defendant the right to call witnesses only when the Government's case is weak; on the contrary, when the Government's case is based upon "voluminous" evidence, a trial court should be especially vigilant in ensuring that a defendant is accorded his Sixth Amendment right to defend himself.
 
 
 [15]
 Presumably the Government would have challenged the credibility of these aspects of Alexander's testimony. The assessment of Alexander's credibility and the weight to be accorded his testimony--if any--was properly for the jury to determine.